**Walkesheia WARD,[1] Darlena McBride, Tanya Gardner, Robert Donelson, Raquel Maiden, Charles Smith, Laronica Williams,[2] Latoya Young, Machelle Guy, Roscoe Haymon, Robert Williams, Damenica Johnson, and James Thomas,[3] Plaintiffs,**

**v.**

---

**1.** The Estate of Walkesheia Ward is a substitute party for Walkesheia Ward. *See* Clerk's No. 169.

**2.** Laronica Williams was dismissed from the instant case by stipulation of the parties. *See* Clerk's No. 123.

VON MAUR, INC., Defendant.

Equal Employment Opportunity Commission, Plaintiff,

v.

Von Maur, Inc., Defendant.

Darlena McBride, Tanya Gardner, Robert Donelson, Raquel Maiden, Charles Smith, Laronica Williams, Latoya Young, Roscoe Haymon, Robert Williams, and James Thomas, Plaintiff–Intervenors,

v.

Von Maur, Inc., Defendant.

Nos. 3:04–CV–00159, 4:06–CV–00182.

United States District Court,
S.D. Iowa,
Davenport Division.

Aug. 29, 2008.

---

**3.** James Thomas was dismissed from the instant case for failure to comply with Court order. *See* Clerk's No. 124.

Jean Camp, John Hendrickson, EEOC, Dennis R. McBride, EEOC, Milwaukee District Office, Milwaukee, WI, James Lee, Gwendolyn Young Reams, EEOC, Washington, DC, Jill Weinstein, Erika E. Pedersen, Pedersen & Weinstein LLP, Chicago, IL, Dorothy A. O'Brien, Dorothy A. O'Brien, Attorney & Counselor Law, PLC, Davenport, IA, for Plaintiffs.

Terri Lea Fildes, Elizabeth L. Hubbard, John Campbell O'Connor, Matthew P. Pappas, Pappas & Scnell, P.C., Rock Island, IA, for Defendant, Von Maur Inc.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendant, Von Maur, Inc.'s ("Von Maur" or "Defendant") Motion for Summary Judgment,[4] filed June 2, 2008.[5] Clerk's No. 161. After

---

4. While disregarding Defendant's arguments regarding the intentional infliction of emotional distress claim made in its brief, the Court, nonetheless, refers to the pagination of Defendant's brief filed on June 2, 2008, as opposed to the amended brief subsequently filed by Defendant, which deleted the intentional infliction of emotional distress arguments (as that claim was previously dismissed with prejudice by stipulation of the parties). *See* Clerk's Nos. 52, 175–76.

5. Throughout its brief, Von Maur makes gratuitous remarks. *See, e.g.,* Def.'s Br. at 18 (commenting that Plaintiffs' anecdotal evidence consists of "rank speculation" and is "illogical and paranoid"), 19 ("One is reminded of the line from Andrew Lloyd Web-er's musical, *Evita:* 'She didn't say much, but she said it loud.' And that fits the EEOC's claim of pattern or practice."), 38–39 ("The original three plaintiffs (Ward, McBride and Gardner) promptly went on television in January, 2005, after filing the complaint in late December, 2004, and their attorneys promptly started passing out business cards at the Davenport Civil Rights Commission."), 40 ("Now, Von Maur is caught in the trick bag of being blamed for not being able to produce applications for five plaintiffs ... all of which were undoubtedly validly destroyed in accordance with EEOC's own regulations, or the plaintiffs have fabricated the dates, which is a very real possibility."), 117 ("The EEOC must have known this information was, at least in large part, a total fabrication by its class

being granted an extension (Clerk's No. 180), Plaintiffs, the Estate of Walkeshia Ward ("Ward"), Darlena McBride ("McBride"), Tanya Gardner ("Gardner"), Robert Donelson ("Donelson"), Raquel Maiden ("Maiden"), Charles Smith ("Smith"), Latoya Young ("Young"), Machelle Guy ("Guy"), Roscoe Haymon ("Haymon"), Robert Williams ("Williams"), Damenica Johnson ("Johnson") (collectively "Individual Plaintiffs"), and the Equal Employment Opportunity Commission ("EEOC") (collectively "Plaintiffs") filed a Response on July 18, 2008. Clerk's Nos. 184, 185. After being granted an extension (Clerk's No. 192), Von Maur filed a Reply on August 11, 2008. Clerk's No. 195. The matter is fully submitted.

## I. FACTS

Von Maur is a privately held corporation headquartered in Davenport, Iowa. Def.'s Statement of Material Facts ¶ 1. Von Maur operates twenty-two high-end retail clothing, cosmetic, jewelry, and houseware department stores throughout the Midwest. *Id.* ¶ 2. The Plaintiffs allege that two Von Maur stores, specifically Von Maur Center and NorthPark, both located in Davenport, Iowa, failed to hire them on the basis of their race (African–American). Individual Plaintiffs [6] filed the present lawsuit on December 29, 2004, alleging that Von Maur failed to hire them on the basis of their race in violation of Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. *See* Clerk's No. 1. On April 19, 2006, the EEOC filed a class action [7] alleging that Von Maur failed to hire applicants on the basis of their race in violation of Title VII. *See* Case No. 4:06–cv–182, Clerk's No. 1. Individual Plaintiffs McBride, Gardner, Donelson, Maiden, Smith, Young, Haymon, and Williams intervened in the EEOC case. *See* Case No. 4:06–cv–182, Clerk's No. 15. On July 10, 2006, the Court granted Plaintiffs' Motion to Consolidate the two cases for pre-trial purposes. *See id.*

### A. Von Maur Center

Von Maur Center houses the warehouse/distribution center,[8] the corporate offices, the buyer functions, and the corporate human resources department, which

---

member.") and ("The intriguing aspect of Miller's testimony is that he must have made it up as he went along."), 121 ("This class member has 'sham fact' written all over his—and EEOC's—position.") and ("Material questions of fact cannot be driven by one side's inability to get its falsehoods organized."); Def.'s Reply Br. at 71 ("The only application which could even remotely be at play, assuming his garbled, illogical and inconsistent testimony deserves some credence, is his November, 2004 application."). At best, these types of comments are uncalled for, and at worst, they rise to the level of unprofessional conduct. *See Sonksen v. Legal Servs. Corp.,* 389 N.W.2d 386, 389 (Iowa 1986) (finding it unprofessional, unethical, and a violation of the Rules of Professional Responsibility to make personally demeaning remarks about opposing counsel, the trial court, and general classes of persons). While the remarks made by Von Maur do not rise to the level of being *"outrageously* unprofessional," as they did in *Sonksen,* counsel is cautioned to refrain from making this type of inappropriate remarks in future pleadings in this Court. *See Husinga v. Federal–Mogul Ignition Co.,* 519 F.Supp.2d 929, 932 n. 1 (S.D.Iowa 2007).

6. Individual Plaintiffs Ward, McBride, and Gardner were the named plaintiffs in the initial Complaint. The Complaint, however, was subsequently amended to include additional plaintiffs.

7. The current EEOC class members include Paul Parks ("Parks"), Marlene Jacks ("Jacks"), Havilah Johnson ("Johnson"), La'Quan Miller ("Miller"), Lawanda Jones Allen ("Allen"), and Jacqueline Ash ("Ash") (collectively "Class Members").

8. The warehouse, also referred to as the distribution center, is where all merchandise is shipped. *See* Def.'s Statement of Material Facts ¶ 5.

is composed of two human resources managers, a benefits administrator, and human resources assistants. Def.'s Statement of Material Facts ¶¶ 5, 11. The human resources department at Von Maur Center "conducts store training, develops new hire orientation, and conducts follow-up training with the sales teams on training for new policies and procedures to help develop associates, department managers and executives." *Id.* ¶ 12. Additionally, Von Maur Center also houses the staff for the mail room, the cafeteria, clerical positions, housekeeping, and other hourly positions. *Id.* ¶ 198 n. 5.

When an application is submitted to Von Maur Center, then human resources manager, Lisa Peterson ("Peterson"),[9] or then human resources assistant, Jill Trytten ("Trytten") would initially screen the application. *Id.* ¶¶ 29, 33–34, 39–40, 214. The screening process involves reviewing the application and resume, if any, to determine the applicant's[10] work history, schedule, skills, and availability. *See id.* ¶¶ 217, 227. Peterson, for example, would screen applications based on "information concerning the applicant's longevity, type of similar work, and other factors in the application that impressed her." *Id.* ¶ 223. In effect, Von Maur used the screening process to initially determine if the applicant "might be a good fit in regard to scheduling" and whether the applicant would be "a viable candidate" for Von Maur. *Id.* ¶ 225. The screening process also involved talking to the applicant in person, or over the telephone, to "gain more information from the applicant," such as the types of positions the person is seeking, their available hours, and any incomplete information on the application. *See id.* ¶¶ 216, 230, 234. Applicants would

be screened out if the applicant could not meet the hours requirement or if no openings were available for the position(s) specified. *See id.* ¶ 218. However, the "vast" majority of applicants would pass the screening process. *See id.* ¶ 219.

Although Von Maur maintains a storewide application process, each store makes independent hiring decisions for non-executive positions. *See id.* ¶ 128. In conducting interviews, Von Maur employs "behavior-based interviewing" which is premised on the fact that "a candidate's past employment behavior is the best predictor of future behavior." *Id.* ¶ 98. This behavior-based interviewing is taught from a video entitled, "More Than a Gut Feeling II." *See id.* ¶¶ 96–98. Von Maur has used this video since at least 1993 to train employees who conduct interviews. *See id.* ¶¶ 96–97. Thus, following this behavior-based interviewing concept, the interviewer "will study the job requirements ... and then tailor open-ended interview questions to elicit information from the candidates about his or her abilities in the past to solve problems." *Id.* ¶ 98. Such behavior-based questions, according to Von Maur, allow the interviewer to predict the applicant's future success or failure for the position(s) sought. *See id.* ¶ 103.

According to Von Maur, in reviewing an applicant for the first interview, there is no one factor that disqualifies an applicant, rather, the totality of the application is considered. *Id.* ¶ 274. Although Von Maur maintains a "First Interview Questions" form with pre-set questions, e.g., "What prompted you to apply at Von Maur?", "Why are you interested in this position?", "Describe a coworker that was difficult to work with," etc., interviewers

---

**9.** Alan Place ("Place") replaced Peterson in April of 2004 as human resources manager for Von Maur Center. *Id.* ¶¶ 33–34.

**10.** The Court refers to the term "applicant" in the generic sense, i.e., to refer to an individual applying for a position with Von Maur.

can use their own independent judgment and discretion to determine which questions to ask, so long as pertinent information is gathered to make a decision on an applicant. *Id.* ¶¶ 275, 280; *see* Def.'s App. at 2243–44. Except for an "open house" interviewing process, where all applicants who come in for open positions are interviewed, Peterson decides which applicants to interview. *See* Def.'s Statement of Material Facts ¶ 287. After conducting the first interview, lasting anywhere between five to thirty minutes, Peterson decides which applicants to pass on for a second interview. *Id.* ¶ 288. Peterson estimates that possibly less than 25%, but more than 10%, of the applicants from the first interview move on to a second interview. *Id.* ¶ 289. Of the applicants approved for a second interview, approximately 50% are hired by Von Maur.[11] *Id.* ¶ 291.

During the second interview, applicants are provided with a written job description for the position(s). *Id.* ¶ 301. Von Maur also maintains a "Second Interview Questions" form with pre-set questions, e.g., "What are you looking for in your next job?", "Where do you see yourself in 2 years?", etc. Def.'s App. at 2095. If the position is within the "warehouse" and the second interviewer feels strongly about pursuing an applicant, the applicant is given a tour of the warehouse to provide a perspective of the work environment. *See* Def.'s Statement of Material Facts ¶ 312. After the second interview, the decision "to continue pursuing" the applicant is a collaboration between the two interviewers. *See id.* ¶ 310. Thus, according to Von Maur, no one is ever offered employment during the second interview. *Id.* ¶ 303.

If a decision is made to not pursue the applicant, a regret letter is sent. *Id.* ¶ 316. The letter would be used, for example, if the applicant is not qualified for the position or if there is a more qualified applicant. *Id.* ¶¶ 320, 321. Another version of a regret letter is sent to applicants who are qualified, but who sought a position that is currently not open or that does not exist. *Id.* ¶ 322. Both versions of the regret letter state that the application will be kept active for six months for possible future review. *Id.* ¶ 327. If, however, a decision is made to pursue the applicant, human resources will then conduct reference checks. *See id.* ¶¶ 329–30. Von Maur conducts a reference check to verify the information provided by the applicant. *Id.* ¶ 335. The reference check requires that a minimum of one reference listed on the application be contacted "who can actually speak to the actual work experience of the applicant." *Id.* ¶ 331. If Von Maur decides to hire the applicant after the reference check, the applicant "will fill out a form allowing Von Maur to conduct a check through USIS (formerly USMA) which is a consumer reporting agency that checks the applicant against a theft database." *Id.* ¶ 337. If the applicant accepts the position, Von Maur will, at that point, discuss wages, start date, and uniform requirements for warehouse positions. *Id.* ¶ 338.

### B. NorthPark

NorthPark, located in Davenport, Iowa, has a store manager, human resources personnel, area managers, retail sales personnel, housekeeping, and security staff. *See id.* ¶ 6. Within each store, the store manager is responsible for the overall store functioning, performance, appearance, sales, turnover, and compliance with Von Maur's policies and procedures. *Id.* ¶ 126. The floor manager is responsible for staffing departments, conducting and writ-

---

**11.** It appears that Peterson conducted the first interview for hourly and warehouse positions, while Sheri Bealer ("Bealer"), Traffic Manager, usually conducted the first interview for truck drivers. *See id.* ¶¶ 286, 298; Def.'s App. at 84.

ing reviews, hiring, meeting department sales goals, merchandising each department, customer service quality, resolution of customer concerns, and store cleanliness. *Id.* ¶ 127. The human resources personnel at the NorthPark store reports to Gayle Haun ("Haun"), Director of Human Resources, who works out of Von Maur Center. *See id.* ¶¶ 8, 9, 15. Haun, for the most part, conducts classroom training for employees conducting interviews. *Id.* ¶ 18. Haun also visits the Von Maur stores, audits the employee files and applications, conducts training, sits in on interviews and screenings, evaluates the individual human resources departments, and provides coaching to staff. *Id.* ¶ 19. It appears from the record that NorthPark follows the same screening, interviewing, and hiring process of that used at Von Maur Center. *See generally* Def.'s Statement of Material Facts.

### C. Open House Interviewing: June 2003 and June 2004

In June 2003 and again in June 2004, Von Maur Center conducted "open house" interviewing. *See id.* ¶ 349. During an open house interview process, every person who comes in is guaranteed at least one interview, and is not subject to the initial screening noted above. *See id.* ¶ 350. In June 2003, Von Maur opened four new stores and needed additional staff for the warehouse (housed in Von Maur Center). *Id.* ¶ 354. Cathy Rockwell ("Rockwell"), the distribution center manager,[12] informed human resources of her staffing needs in the warehouse. Von Maur subsequently advertised for a two day "open house" in June to fill the open warehouse positions. *Id.* ¶¶ 355–56; Def.'s App. at 1250. The advertisements, placed in local papers, stated that on-site interviews would be conducted at Von Maur

Center. Def.'s Statement of Material Facts ¶ 357. During the open house, approximately five to six managers conducted the interviews. *Id.* ¶ 356.

The following year, Von Maur Center again advertised for a two-day open house scheduled for June 21 and 22, 2004. The open house interviews, advertised in local papers, yielded almost 200 applicants. *Id.* ¶ 385. It appears that Von Maur was filling open positions for merchandise processor (marking room), stock, and shipping and receiving, all within the warehouse (collectively referred to by the parties as "warehouse positions"). *See id.* ¶¶ 367, 379. After the first day of interviewing, Von Maur had enough applicants for the stock and shipping and receiving positions, but not for the merchandise processing positions. *Id.* ¶ 367. Accordingly, on the second day of the open house, Von Maur posted a sign at the entrance of the interview area which stated that Von Maur had "enough applicants for stock and receiving" but that applicants were "welcome to stay"—presumably to interview for the merchandise processing positions or to be considered for future openings. *See id.* ¶¶ 370–72, 382.

### D. Von Maur Policies

#### 1. Equal employment policies.

Von Maur maintains an anti-discrimination policy in its employee handbook which states:

> Von Maur provides equal employment opportunities (EEO) to all employees and applicants for employment wholly on the basis of ability, experience, training, performance and other factors which are related to the position and the degree or ability necessary to perform the job. This policy applies to all terms

---

**12.** As the distribution center manager, Rockwell is responsible for ensuring that the products "go[ ] out to the stores," unloading all inbound trailers, loading all outbound trailers, staffing, and overseeing vendor returns. Def.'s App. at 1252.

and conditions of employment, including but not limited to, hiring, placement, promotion, termination, layoff, recall, transfer, leaves of absence, compensation and training. Von Maur *expressly prohibits* any form of unlawful employee harassment, based on race, color, religion, gender, national origin, age or disability. Improper interference with the ability of Von Maur employees to perform their expected job duties is not tolerated.

*Id.* ¶ 45 (emphasis in original). Von Maur's application for employment provides: "Von Maur is an Equal Opportunity Employer. Regardless of race, color, age, marital status, religion, national origin, sex and mental or physical disability our practice is to ensure equal opportunity for each individual." *Id.* ¶ 54.

### 2. *Record-retention policy.*

Von Maur's written document retention policy provides that applications be retained for one year. *Id.* ¶ 392. Each of the Von Maur stores retain applications for one year, then sends them to Von Maur Center. *Id.* ¶ 394. It appears that after the one year mark, the applications were at one point "deposit[ed]" in a garbage bin, but that later they were shredded, once Von Maur acquired an industrial shredder. *Id.* ¶ 403. Haun keeps any applications involved in employment discrimination claims in her office. *Id.* ¶ 395.

### E. *Individual Plaintiffs*

#### 1. *Estate of Walkesheia Ward.*

On or about May 29, 2003, Ward went to Von Maur Center with a former Caucasian coworker and friend, Kristy Renkosik ("Renkosik") for employment applications. *See id.* ¶ 481. Both Ward and Renkosik filled out and returned an application to human resources. *Id.* ¶ 483. Ward, who was unemployed at the time, applied for "any open position" at Von Maur. *Id.* ¶¶ 476, 482. Ward stated on her application that she was never discharged by any

employer, even though Ward received a document from her former employer, Kraft Foods, Inc./Oscar Mayer Foods Division, which stated that Ward was terminated effective August 2, 2002 "due to a violation of Company/Attendance Policy and Procedures." *Id.* ¶ 479. Ward also stated on her application that she did not, during the past year, miss any days of work or school. *Id.* ¶ 484. Moreover, for a period of time after her employment with Oscar Mayer, Ward worked at Holiday Inn cleaning rooms. *Id.* ¶ 480. Ward, however, did not list her employment with Holiday Inn on Von Maur's application form, although the form requests that applicants list their last four employers. *Id.* ¶ 484. Unaware of any discrepancies on Ward's application, Peterson (the human resources manager at Von Maur Center) interviewed Ward on May 30, 2003. *Id.* ¶ 485. Because there was an immediate need to fill open merchandise processor positions, Peterson only considered Ward for that position. *See id.* ¶ 488.

As noted previously, prior to scheduling a first interview, an application is screened by either Peterson or Trytten (the human resources assistant at Von Maur Center). *See id.* ¶ 214. During the screening process, the applicant is contacted by telephone to ensure that the applicant is available to work the required hours. *See* Def.'s App. at 1124, 1130. If the applicant is not available for the required hours, the applicant is screened out and would not be interviewed. *See id.* at 1130. Thus, Peterson testified that Ward "absolutely" stated during the screening process that she would be available for the required hours—because otherwise, Ward would not have been interviewed. *Id.* However, when Peterson attempted to confirm Ward's availability to work the required hours during the interview, Peterson claims that Ward remained vague and noncommittal. *See id.* at 1128; Def.'s State-

ment of Material Facts ¶ 496. Specifically, according to Peterson, Ward could not state for certain that she would be available, but answered that she "should be" or "probably could" be available for the required hours. *See* Def.'s App. at 1128. Peterson, moreover, stated that she had repeated and rephrased her questions to Ward numerous times, especially those questions relating to Ward's availability, when all of a sudden, Ward "blurted out in almost a yell tone" that she was let go from Oscar Mayer because she "missed a lot of work due to attendance." *Id.* at 1120, 1122. Peterson testified that Ward's statement effectively ended the interview. Def.'s Statement of Material Facts ¶ 500. Ward denies that she told Peterson during the interview that she was let go from Oscar Mayer because she missed a lot of work. Pls.' Am. Statement of Material Facts ¶ 70. Rather, Ward states that she told Peterson that she voluntarily left her employment with Oscar Mayer because the various shifts interfered with her full-time school schedule. *Id.* ¶¶ 71, 73. Peterson estimates that the entire interview with Ward took approximately fifteen minutes or less. Def.'s App. at 1119. Thereafter, Peterson made the decision not to hire Ward because Ward could not state with any certainty that she would be available for the hours required, and because Ward expressed that she had attendance problems in the past. *See* Def.'s Statement of Material Facts ¶ 506 ("Von Maur does not hire people with attendance problems."). Ward was sent a standard regret letter from Von Maur.[13] *Id.* ¶ 505.

### 2. *Darlena McBride.*

On May 29, 2003, the same day that Ward filled out her application, McBride, who is Ward's mother, also went to Von Maur Center with Ward and Tanya Gard-

ner (another plaintiff in this case) to get an application. *Id.* ¶ 531. On her application, McBride listed her former employment as a dental office assistant from July 1986 through May 1990. *See id.* ¶ 525. At some point, McBride learned that Von Maur Center was holding an open house interview and she returned approximately two weeks later, in mid-June 2003, to participate. *See id.* ¶ 532. McBride informed the receptionist that she had already filled out an application a couple of weeks before. The receptionist, however, could not locate McBride's initial application and asked her to fill out another one. *Id.* ¶¶ 533–34. After completing another application, McBride waited approximately twenty-five minutes and was interviewed by Jeri Bryan ("Bryan"), assistant manager of the distribution center. *See id.* ¶¶ 537–38.

McBride, who applied for the positions of merchandise processor, data entry, and customer service, made a comment during the interview that Bryan found to be "offensive and negative." *Id.* ¶¶ 539, 542. Specifically, McBride recounted an incident during her tenure as a dental assistant, when a "gay" man urinated all over the restroom and McBride refused to clean it up. *Id.* ¶ 540. Bryan, who happens to be a lesbian, found McBride's comment concerning the "gay" man inappropriate, offensive, and negative. *See id.* ¶¶ 541–42. Given that the positions McBride applied for required the applicant to have proper communication skills, e.g., communicate well with others, use appropriate language, etc., Bryan had concerns about McBride's communication skills. *See id.* ¶¶ 546, 550–51. Thus, Bryan decided not to pursue McBride as a candidate because she lacked communication skills, i.e., labeling a patient by his sexual orientation in an offen-

---

**13.** Renkosik, who was interviewed by Peterson on the same day as Ward, was hired by Von Maur. *See* Def.'s Statement of Material Facts ¶¶ 486, 518

sive and negative manner. *See id.* ¶¶ 543, 546, 549. On June 12, 2003, Von Maur sent McBride the standard regret letter. *See id.* ¶ 561. McBride, however, disputes that she made disparaging remarks about "gay people" during the interview. Pls.' Am. Statement of Material Facts ¶ 179.

### 3. *Tanya Gardner.*

On May 29, 2003, Gardner, friend of both Ward and McBride, went over to Ward's house to visit. Def.'s Statement of Material Facts ¶ 567. Ward, however, was taking her mother, McBride, to Von Maur Center to get an application. Gardner went along with Ward and McBride to Von Maur Center. *See id.* ¶ 566. Gardner also requested and completed an application. *Id.* ¶¶ 568–69. Approximately a week later, Ward advised Gardner that Von Maur Center was having an open house interview and suggested that Gardner attend the open house. *Id.* ¶ 570. On June 9, 2003,[14] Gardner attended the open house interview and informed the receptionist that she had submitted an application previously and that she was still interested in employment with Von Maur. *Id.* ¶ 573. The receptionist, however, could not locate Gardner's application and asked that she fill out another application. *Id.* ¶ 574. Gardner filled out another application and was interviewed for open warehouse positions by Haun, director of human resources. *Id.* ¶ 576.

During her interview with Haun, Von Maur contends that Gardner mentioned plans of attending beauty school. *See id.* ¶¶ 578, 581. Gardner, however, states that she only mentioned that she hoped to attend beauty school some day. *See* Pls.' Am. Statement of Material Facts ¶ 119.

After the interview, Haun decided not to pass Gardner for a second interview because she had concerns about Gardner employment history. That is, on her application, Gardner listed her employment history as follows:

(1) Staples from July 1 through October 20, 1998;

(2) IBP, dates uncertain but less than a year;

(3) American Honda warehouse from March 16, 1999 through April 20, 1999;

(4) Staples, part time, from May 5, 1999 through November 29, 2000;

(5) Heinz from June 7, 2001 through August 28, 2001;

(6) Unemployed from August 2001 through August 2002; and

(7) Holiday Inn, housekeeping, from August 2002 to present (June 2003).

Def.'s Statement of Material Facts ¶ 565. Based on this information, Haun had concerns about Gardner's longevity, i.e., that Gardner would not stay long term with Von Maur as she had worked in several different places for short durations, seemed "unfocused," and mentioned beauty school. *See id.* ¶ 581. Accordingly, Haun did not pass Gardner for a second interview. *Id.*

### 4. *Robert Williams.*

In June 2003, Von Maur advertised open warehouse positions in the local newspaper. Pls.' App. at 65. In response to the advertisement, Williams applied for the warehouse positions on or about June 23, 2003. *Id.* Williams was then asked to wait for an interview. Def.'s Statement of Material Facts ¶ 899. Williams waited approximately one and one-half to two hours

---

**14.** It is unclear from the record on what two days the June 2003 open house interview process took place. As it pertains to McBride, Von Maur notes that the 2003 open house took place in mid-June, while for Gardner, Von Maur notes that the open house took place on June 9, 2003. *See id.* ¶¶ 532, 573. Regardless, the parties do not dispute that both McBride and Gardner participated in Von Maur Center's June 2003 open house.

for his interview, which last approximately three to five minutes. Pls.' Am. Statement of Material Facts ¶¶ 147–48. Amy Davis ("Davis"), Von Maur Center's Training Manager, interviewed Williams in her office. Def.'s Statement of Material Facts ¶¶ 903–04. Davis had concerns about Williams' longevity in a warehouse position, noted that he was pursuing a degree in radiology, "a totally unrelated field," and wondered if he could meet scheduling demands with his school load. Id. ¶¶ 905, 909. Davis consulted with either Rockwell or Bryan who told her that they had a number of applicants for warehouse positions with no longevity concerns. Id. ¶ 907. Davis, therefore, did not pass Williams for a second interview. Id. ¶ 910.

The following year, Von Maur Center advertised another open house, scheduled for June 21 and 22, 2004. On the second day of the open house, June 22, 2004, Williams again applied for employment with Von Maur. Id. ¶¶ 919–20. Williams applied for warehouse positions. Id. ¶ 920. After the first day of the open house, however, Von Maur claims that it had enough applicants for the "stock" and "shipping and receiving" positions. Id. ¶ 367. That is, Von Maur decided to fill all open stock and shipping and receiving positions with applicants from the first day of the open house (June 21), and posted a sign at the entrance of the interview area that stated Von Maur had "enough applicants for stock and receiving." See id. ¶¶ 370–72, 921.

Regardless, Williams went to the reception desk and filled out an application. Id. ¶ 925. While waiting for his interview, Williams states that he heard a Caucasian woman wearing sweat pants and a "holey" t-shirt tell her friend that she was hired. Pls.' Am. Statement of Material Facts ¶ 151. Williams also spoke to a Caucasian man who informed Williams that he had been hired and that he was currently going to school to get his GED. Id. ¶ 152. Williams observed that people who came in after him were interviewed before him. Id. ¶ 153. Williams, however, left the waiting area at least twice to smoke, and if an applicant is not present and does not answer when their name is called, the applicant is placed on the bottom of the interview list. See Def.'s Statement of Material Facts ¶¶ 363–65, 928–29. Bryan interviewed Williams for approximately five minutes. Id. ¶ 940; Pls.' Am. Statement of Material Facts ¶ 154. During the interview, Williams told Bryan that he was interested in the warehouse positions. Def.'s App. at 1635. Based on this information, Bryan decided not to pursue Williams for further consideration because "shipping and receiving positions were filled and [Williams] was not considered for the merchandise processing position because of concerns about his employment longevity." Def.'s Statement of Material Facts ¶ 942.

### 5. Robert Donelson.

Donelson participated in Von Maur Center's June 2004 open house. Specifically, Donelson came in on June 22, 2004, the second day of the open house, and applied for stock or shipping and receiving positions. Id. ¶ 588. After the first day of interviewing, however, Von Maur had enough applicants for the stock and shipping and receiving positions. Id. ¶ 367. Accordingly, on the second day of the open house, Von Maur posted a sign at the entrance of the interview area that stated Von Maur had "enough applicants for stock and receiving." See id. ¶ 370.

At the time Donelson applied with Von Maur, he was employed at John Deere PCD, earning $10.57 per hour. Id. ¶ 596. Prior to starting at John Deere on March 21, 2004, Donelson worked for Swords Veneer as a machine operator/supervisor,

from June 1989 until they closed in December of 2003. *Id.* ¶ 595. As a supervisor at Swords Veneer, Donelson would schedule workers' shifts, diagnose problems, give work orders, supervise and coordinate worker activities, interpret company policy, enforce safety regulations, hire employees, study and implement production schedules, estimate worker hours needed to complete a project, and address problems as they occurred. *Id.* ¶ 599. During his interview with Von Maur, he relayed his supervisory skills. *Id.* ¶ 600. Donelson first interviewed with Haun, who informed him that Von Maur had enough candidates for the stock and shipping and receiving positions from the day before. *Id.* ¶ 607. Donelson contends that during the interview process, he was asked if he could "prove that he had a high school diploma." *Id.* ¶ 609. Next, Donelson was interviewed by an unidentified man, and they discussed Donelson's supervisory skills. *Id.* ¶ 613. Donelson was then interviewed by a woman, who also reviewed his application and resume with him. *See id.* ¶ 615. Thereafter, Haun noted on Donelson's application that he should be called if any positions in stock or shipping and receiving opened in the future. *Id.* ¶ 616.

Haun stated that she did not consider Donelson for the merchandise processor positions because even though such positions were still open, he was overqualified. *See id.* ¶¶ 620, 622. That is, the merchandise processor position is an entry-level position with a starting pay of $8.75. *Id.* ¶¶ 597, 620. Haun determined that, based on Donelson's supervisory experience and current compensation at John Deere, he would find the entry-level position "unsatisfying" and thus, was unlikely to remain in the position long-term. *Id.* ¶ 620. It appears that although Donelson's application was retained by human resources in "active status" for six months, such applications would be reviewed for subsequent openings only if Rockwell requested it. *Id.* ¶ 619. Regardless, Von Maur contends that it did not hire anyone into stock or shipping and receiving positions until July 18, 2005, well after Donelson's six month "active status" had expired.[15] *Id.* ¶ 618.

### 6. *Roscoe Haymon.*

On or about August 12, 2004, Haymon applied for a truck driver position with Von Maur. *Id.* ¶ 802. Haymon applied in-person at Von Maur Center and handed his application to the receptionist, who told him that no one was available to interview him because everyone was at lunch. *See* Def.'s App. at 573. The receptionist informed Haymon that someone would be in contact. *Id.* Bealer, who at that time was responsible for hiring, evaluating, and terminating truck drivers received Haymon's application. *See* Def.'s Statement of Material Facts ¶ 837. Bealer asked Keith Turner ("Turner"), a Von Maur truck driver who had worked with Haymon for nine years at Eagle Foods what he thought of Haymon. *See id.* ¶ 847; Pls.' App. at 1050. Turner stated that Haymon was "the nicest guy," but that "he's never in a hurry." Def.'s Statement of Material Facts ¶ 848. Turner believes that he told Bealer that she may encounter the same problem with Haymon that she had with a former Von Maur truck driver, Matt Costello, who was known to take one to two hours longer than all the other truck drivers.[16] Pls.' App. at 1050. Bealer also spoke with Jane Morgan ("Morgan"), another Von Maur

---

15. As noted above, pursuant to policy, Von Maur maintains applications "active" for six months for possible future openings. *See id.* ¶ 327.

16. On July 9, 2004, Costello voluntarily resigned from Von Maur because he was "dissatisfied" with his position. Def.'s App. at 1853.

truck driver who had worked with Haymon at Eagle Foods.[17] Def.'s Statement of Material Facts ¶ 852. Morgan testified that she told Bealer that Haymon would be a good person to hire, that she thought he had a perfect driving record, and that she would highly recommend Haymon. Pls.' App. at 927. Although Morgan did not verbalize this concern, she wondered if Haymon would be able to get the "runs" completed within the allocated time. Def.'s App. at 963. Morgan, who described herself as "hyper" did, however, tell Bealer that Haymon drove more slowly than she did. Id.; Def.'s Statement of Material Facts ¶ 852. Based on Turner's and Morgan's impressions, Bealer decided not to pursue Haymon as a truck driver. On or about August 23, 2004, Von Maur sent Haymon the standard regret letter, informing him that his application would remain active for six months. Def.'s App. at 616.

### 7. *Charles Smith.*

On August 22, 2004, Von Maur Center placed an advertisement for open regional truck driver positions. *See* Def.'s Statement of Material Facts ¶ 671. On September 16, 2004, Smith applied in-person for the truck driver position. *Id.* ¶ 670; Pls.' Am. Statement of Material Facts ¶ 232. At the time of his application, Smith had thirty years of truck driving experience and had a safe driving record. Pls.' Am. Statement of Material Facts ¶ 232. Smith was briefly interviewed by Place and Bealer when he submitted his application. *Id.*

¶ 233; Def.'s Statement of Material Facts ¶¶ 685, 687.

That same day, pursuant to policy, Von Maur ran a credit check on Smith.[18] Def.'s Statement of Material Facts ¶ 676. The credit report on Smith contained "derogatory information about his credit," specifically that Smith had various debts, including extensive unpaid tax liens. *Id.* ¶¶ 689, 691. Haun wrote Smith advising him of the "derogatory information" and included the credit report for his reference. *Id.* ¶¶ 689–90. In the letter, Haun wrote, "[i]f there is any information on the credit report that is inaccurate or that you would like to contact us to explain, please feel free to give me a call ... [w]e plan to make our final hiring decision in approximately one week." Def.'s App. at 1462. After receiving the letter from Haun, Smith states that he contacted Von Maur on three different occasions to discuss his credit report. Pls.' Am. Statement of Material Facts ¶ 237. The first time, Smith called Von Maur and left his name and phone number, requesting that Haun return his call. Two days later, Smith called and left a voice message with his name and number, requesting a return call. The third time, Smith again left a voice message with his name and number and stated that he was calling to explain his credit report. *Id.* According to Smith, no one returned his phone calls. Von Maur, on the other hand, contends that Smith never contacted Haun to explain his credit report. Def.'s Statement of Material Facts ¶ 698. Von Maur, accordingly, did not hire Smith because he did not respond to Haun's letter regarding his credit report.[19]

---

17. Morgan, Turner, and Haymon all used to work together at Eagle Foods as truck drivers.

18. Von Maur has a policy which requires truck driver applicants who are "further considered for employment" to undergo a credit check. Def.'s Statement of Material Facts ¶ 676.

19. Von Maur, moreover, states that even if Smith contacted Haun, his explanations would not have been sufficient to permit Von Maur to consider hiring him, as discussed in more detail below. *Id.* ¶¶ 701–02. That is, Von Maur will only consider hiring applicants if the derogatory credit report result from factors "beyond an applicant's control, such as erroneous credit information, debts from a divorce or unexpected medical debts because

Pls.' Am. Statement of Material Facts ¶ 239.

### 8. *Latoya Young.*

Sometime between May and the end of 2003, Young saw a newspaper advertisement stating that Von Maur was hiring for warehouse, data entry, and clerical jobs. *Id.* ¶ 159. In response to the advertisement, Young went in-person to fill out an application for all three positions. *See id.* ¶¶ 158–59. Although Von Maur does not have Young's application, Von Maur admits that Young went to Von Maur Center to submit an application. Def.'s Statement of Material Facts ¶¶ 712, 722. Von Maur, moreover, admits that Young called a couple of days later to inquire about the status of her application and that she was told that Von Maur was still reviewing applications. *Id.* ¶ 724. A week later, Young again called to follow-up on her application, and was informed that someone would get back to her. *Id.* ¶ 725. Shortly thereafter, Young received a letter from Von Maur stating that the positions were filled. *Id.* ¶ 726. However, approximately a week after receiving her regret letter, Young claims she saw another advertisement in the newspaper for open warehouse positions. *Id.* ¶ 727.

### 9. *Damenica Johnson.*

On June 10, 2003, Johnson applied for the sales audit, invoice keyer, and credit associate positions at Von Maur Center after seeing an advertisement for the positions. *See id.* ¶¶ 947, 949. Johnson turned in her application to Amy Nemmers ("Nemmers"), human resources assistant. Pls.' Am. Statement of Material Facts ¶ 315. Johnson informed Nemmers about her credit union experience and asked how many people were going to be hired for the credit associate position. *Id.* ¶ 309. Nemmers stated that there were

quite a few openings and that someone would get in touch with her. *Id.* Von Maur, however, did not contact Johnson. Johnson claims she continued to see advertisements for the same positions. *Id.*

Von Maur contends that Johnson was not hired because she was screened out. *See* Def.'s Statement of Material Facts ¶ 959. Specifically, on her application under "please indicate the times you can work," Johnson noted "5 to close" for Mondays through Fridays, "open to close" for Saturdays, and placed hyphens for Sundays. Def.'s App. at 736. Von Maur states that both the sales audit and invoice keyer positions are full-time positions which require working during the day, and that Von Maur has only one credit associate position scheduled for evenings and weekends, including Sundays. Def.'s Statement of Material Facts ¶¶ 957–58. That is, because Johnson indicated "5 to close" for Mondays through Fridays, she was screened out of the full-time positions (sales audit and invoice keyer), and the hyphens for Sundays, presumably denoting that Johnson was not available to work on Sundays, screened her out for the evening/weekend credit associate position. Nemmers, however, testified that if the only issue is an applicant's availability, her "normal practice" would have been to call the applicant to verify that the applicant was not available to work the required hours/days. *See* Pls.' App. at 950. Nemmers, however, did not contact Johnson to verify whether she could work on Sundays. Pls.' Am. Statement of Material Facts ¶ 317.

### 10. *Machelle Guy.*

In 1999, Guy worked at Von Maur's SouthPark store in the men's furnishings department for approximately one month before she voluntarily resigned. Def.'s

of an applicant's or family member's hospital-

ization or medical care." *Id.* ¶ 702.

Statement of Material Facts ¶¶ 740, 742–43. In the summer of 2000, Guy applied for Von Maur's executive training program at SouthPark. *Id.* ¶ 751. Von Maur interviewed Guy, but she was not hired for the program. *Id.* ¶¶ 753–56. Next, in June or July 2003, in response to a newspaper advertisement announcing openings for "buying jobs," Guy applied for the Buyer and the Buyer Assistant positions. Pls.' Am. Statement of Material Facts ¶ 271. Although Guy was not primarily interested in a clerical position (Buyer Assistant), Guy states she would have accepted any position that would have assisted her in getting into a "buying" position at Von Maur. *See id.* ¶¶ 274–75. According to Von Maur, if an applicant applies for the Buyer Assistant position but aspires to become a Buyer, Von Maur would inform the applicant that the most direct path to becoming a Buyer is to first work the retail store to "learn the store end of things." Pls.' App. at 801; Pls.' Am. Statement of Material Facts ¶ 282. Accordingly, if the applicant is interested in taking this career path, Von Maur forwards the application to the retail store. Pls.' Am. Statement of Material Facts ¶ 282. When Guy turned in her application, however, no one inquired about Guy's interest nor did anyone inform her of the retail store option.[20] *Id.* ¶ 283. Indeed, when Guy asked if there was anyone in human resources she could speak with, the receptionist stated that no one was available at that time and told Guy that someone would get back to her. Pls.' App. at 760. Guy subsequently called Von Maur three times to follow-up on her application. On each occasion, she was either told that someone would get back to her or that the position was filled. Pls.' Am. Statement of Material Facts ¶ 273. Guy, however, subsequently saw a newspaper advertisement for buying positions, which led her to believe that the positions were not filled. *Id.*

### 11. *Raquel Maiden.*

In April of 2004, Maiden applied for a sales position at Von Maur's NorthPark store. Def.'s Statement of Material Facts ¶ 624. Maiden's "Application for Employment," signed and dated April 22, 2004, states that Maiden was referred to Von Maur as a walk-in applicant. Def.'s App. at 856–57. Lisa Nelson ("Nelson"), a NorthPark floor manager, interviewed Maiden the following day, on April 23, 2004. *Id.* at 857; Pls.' App. at 267–69. Although Nelson does not recall anything about Maiden's interview, or Maiden for that matter, based on what she "read in here" (presumably Maiden's application, resume, and Nelson's First Interview Question notes), Nelson "thought [Maiden] would be better suited to a fast-paced area." Def.'s App. at 994–95. Nelson further testified that the notation "verbal" on Maiden application denotes that Nelson verbally told Maiden that Von Maur would be "pursuing other candidates for the open positions for the store, and that if something became available, [she] would call to set up another interview." *Id.* at 995. Nelson states that Maiden's application was then placed in the "active file," i.e., Maiden's application would remain on "active status" for six months for consideration for future openings. *Id.* at 991. Maiden claims that when positions subsequently opened in a "fast-paced area," Von Maur did not contact Maiden, but instead hired white applicants, Mollie Rodman, Leanne Rade, and Amanda Wadsworth, all of whom applied for positions shortly after

---

**20.** Von Maur does not have Guy's 2003 application, but admits that "Guy went to Von Maur's corporate headquarters and asked the receptionist for an application ... which she then filled out." *Id.* ¶¶ 775, 776.

Maiden. Pls.' Am. Statement of Material Facts ¶¶ 215–220.

Maiden testified that in July 2004, she again applied for employment at Von Maur after seeing a newspaper advertisement for open positions and was interviewed shortly thereafter. *Id.* ¶¶ 212–13. Von Maur, however, contends that Maiden's July interview was a second-round interview from Maiden's first application. *See* Def.'s Statement of Material Facts ¶ 643. Regardless, Maiden was interviewed on July 29, 2004 by Shelie Roldan ("Roldan"), NorthPark human resources manager.[21] *Id.* During the interview, in response to: "Tell me about a time when you had to communicate negative or unfavorable information to someone," Maiden recounted an incident at DHL where Maiden spoke to her manager about her pay after two co-workers informed Maiden that she was being paid less than they were being paid for the same job. *See* Def.'s App. at 836–37; Pls.' App. at 273. When Maiden approached her DHL manager, Maiden was told that she should not be talking about pay, but Maiden was not disciplined in any manner for bringing the pay discrepancy to the manager's attention. *See* Def.'s App. 837; Pls.' App. at 273. Indeed, Maiden testified that she eventually received a raise "after my manager fought for me." Def.'s App. at 837. At the time of Maiden's interview, Von Maur had a policy that prohibited any discussion of wage or salary with anyone except human resources or payroll. Def.'s Statement of Material Facts ¶ 656. Thus, based on Maiden's response, Roldan had concerns that Maiden would discuss her wage and salary with co-workers at Von Maur. *See id.* Additional-ly, Roldan had concerns about Maiden's longevity in past employment[22] and Maiden's ambiguity regarding whether she wanted to work full- or part-time. *See id.* ¶¶ 658, 660. Roldan, therefore, decided not to hire Maiden and sent her a standard regret letter. *Id.* ¶¶ 658, 663.

### F. EEOC Class Members

#### 1. Paul Parks.

On October 25, 2004, Parks applied for a truck driver position at Von Maur Center after seeing an advertisement for open positions. *Id.* ¶¶ 971, 975. An unidentified woman who took Parks' application tried to get Parks an interview while he was there, but ultimately informed him that the person who needed to interview him could not see him at that time. *Id.* ¶¶ 980–81, 986. Parks was never interviewed for the position, even though he had twenty-five years of truck driving experience. Three days later, on October 28, 2004, Rich Pannell ("Pannell"), a Caucasian applicant, applied for a truck driver position after seeing the same advertisement. Pls.' App. at 556; Def.'s Statement of Material Facts ¶ 1004. Pannell, who had approximately nine years of truck driving experience at that time, was interviewed the same day. *See* Def.'s Statement of Material Facts ¶ 1005; Pls.' App. at 557. Von Maur hired Pannell on December 20, 2004. Def.'s Statement of Material Facts ¶ 1004. Parks, however, received a regret letter from Von Maur stating that it hired "someone within their own workforce." *Id.* ¶ 995. Von Maur contends that although Parks "met the minimum qualifications" for a truck driv-

---

**21.** Notably, Roldan used the "Sales Associate Second Interview Questions" form during Maiden's July 29, 2004 interview. Pls.' App. at 272.

**22.** Maiden's resume listed the following employment history: Kids Club (May 2001 to May 2002), APAC (May to August 2002), One Solution Staffing (May to September 2003), and Kmart (September 2003 to January 2004). Pls.' Am. Statement of Material Facts ¶ 214.

er, Pannell "was clearly the best qualified." Def.'s Br. at 99.

### 2. *Marlene Jacks.*

On May 21, 2004, Jacks, Associate Dean for Admissions at Grinnell College, applied at Von Maur's NorthPark location for a part-time sales associate position to supplement her income. Pls.' Am. Statement of Material Facts ¶¶ 185–86. At the time Jacks applied, she was not seeking a seasonal position, but rather was interested in a part-time position that would continue into the school year. *Id.* ¶ 191. That same day, Jacks was interviewed by Roldan. *Id.* ¶ 193. During the interview, which lasted approximately forty-five minutes to an hour, Roldan asked about Jacks' availability. Def.'s Statement of Material Facts ¶¶ 1026–27. They discussed the fact that Jacks had a full-time position at Grinnell College, and that Jacks wanted to work about one day out of the week and possibly weekends. *Id.* ¶ 1026. On her application, Jacks wrote that she was available from 5–9 pm on Mondays, 4–9 pm on Wednesdays, Thursdays, and Fridays, and either 10–5 pm or 1–5 pm on Saturdays. Pls.' Am. Statement of Material Facts ¶ 190. Roldan passed Jacks for a second interview. Three days later, on May 24, 2004, Jacks had a second interview with Bea Lommell ("Lommell"), then floor manager at NorthPark. *Id.* ¶ 193; Def.'s Statement of Material Facts ¶ 53. During the interview, they discussed Jacks' travel schedule for Grinnell College. Def.'s Statement of Material Facts ¶ 1040.

Despite Jacks' educational and professional background, Lommell did not believe that Jacks was any more impressive than any other Von Maur applicant. *See id.* ¶ 1041. Lommell and Roldan discussed Jacks' application and concluded that Jacks wanted a summer job, that with her Grinnell College work schedule she would be unable to devote twenty hours a week, and that she would "be gone" by the time school started in the fall. *Id.* ¶ 1060. Lommell made the "judgment call" that Jacks would not give Von Maur the dependability and longevity Von Maur required once the school year started. *See id.* ¶ 1043. Approximately a week after her second interview, Jacks received a standard regret letter from Von Maur. *Id.* ¶ 1047.

### 3. *Havilah Johnson.*

Johnson applied to Von Maur's North-Park store on three separate occasions. Johnson first applied to Von Maur shortly after her high school graduation, which was in May 2001. Pls.' App. at 871. Johnson applied again approximately a month later, in June 2001. *Id.* There is conflicting testimony regarding the last time Johnson applied for employment at Von Maur.[23] Initially, Johnson testified that although she did not know the exact dates of her applications, all three applications were in 2001. Def.'s App. at 762 ("Q: Okay, so in 2001, before June of 2001, you submitted three applications? A: I don't know the exact date, but it was in 2001."). Johnson testified that she applied to NorthPark before she started working at Valley Shelter in 2001. *See id.* at 744, 762. Lastly, when asked whether Johnson ever applied to Von Maur in 2002, 2003, 2004, or 2005, Johnson replied, "Not that I can recall." *Id.* at 764. The following exchange, however, occurred during Johnson's subsequent questioning by Plaintiffs' counsel:

Q: Okay. Now, maybe I was the only one who was confused, but I was con-

---

**23.** The approximate date of Johnson's application is significant because if Johnson's third application for employment at NorthPark was prior to October 10, 2002, her claim would be barred by the statute of limitations, discussed *infra*.

fused by the dates here so I'd like to go over these. Do you recall applying to Von Maur three times; is that right?

A: Yes, sir.

Q: And the first time, as you just testified, was shortly after high school, right?

A: Yes, sir.

Q: And you graduated from high school in May of 2001?

. . .

A: Yes, sir.

. . .

Q: And the second time you applied to Von Maur in response to that ad, how long after the first application was the second application?

. . .

A: A month later—within a month later.

. . .

Q: Okay. Now, the third time you applied to Von Maur what was that in response to?

A: An ad in the paper.

Q: And do you recall when you applied for that job?

A: It was the year of 2003.

Q: And why do you remember that as the year that you applied the third time?

A: Because of NYSP, the summer job that I held down through St. Ambrose, I needed to find another job, and I applied at Von Maur the same time that I applied for Family Resources.

Q: And you're sure of that?

A: I'm positive.

Pls.' App. at 871–72. Johnson, however, testified that she started working at Family Resources in 2001. *See* Def.'s App. at 744 ("Q: When did you start working there? A: 2001."). Regardless, Von Maur contends that Johnson was not hired because Johnson's anticipated enrollment in college in the fall of 2001 would have made her unavailable for the required hours and she was, therefore, not qualified

for the position. *See* Def.'s Statement of Material Facts ¶ 1088.

4. *Lawanda Jones Allen.*

In the summer of 2003, Allen applied for a part-time sales associate position. Allen testified that she picked up an application in-person at NorthPark, took it home to fill out, and returned it in-person to the store. *Id.* ¶¶ 1090–91. At the time of her application, Allen was not specifically aware of any openings at NorthPark. Def.'s App. at 5. Von Maur did not contact Allen regarding her application. Def.'s Statement of Material Facts ¶ 1095.

The following year, on or about June 26, 2004, Allen applied for a data entry position through the *Quad City Times* Virtual Career center, an online application process. *See id.* ¶ 1099. Allen states that Von Maur did not contact her regarding her online application. *See* Pls.' Am. Statement of Material Facts ¶ 201. Von Maur, however, states that Place called and left a voice message for Allen on her answering machine. Def.'s Statement of Material Facts ¶ 1101. Specifically, there is a handwritten notation on Allen's online application, "LM 7/9 @ 12:38." Def.'s App. at 25. Roldan, moreover, states that she tried to call Allen on July 27, 2004—another handwritten notation on Allen's online application states, "Try to call Tuesday 7/27." Def.'s Statement of Material Facts ¶ 1102; Def.'s App. at 26. Von Maur claims that Allen did not return the phone calls. Def.'s Statement of Material Facts ¶ 1103.

5. *Jacqueline Ash.*

On June 22, 2004, Ash went to Von Maur Center's open house after seeing the advertisement in the newspaper. *See id.* ¶¶ 1115–18. Ash applied for open warehouse positions. Pls.' Am. Statement of Material Facts ¶ 155. As noted above, however, after the first day of the open house, Von Maur had enough applicants

for stock and shipping and receiving positions. Def.'s Statement of Material Facts ¶ 367. That is, Von Maur decided to fill all open stock and shipping and receiving positions with applicants from the first day of the open house (June 21), and posted a sign at the entrance of the interview area that stated Von Maur had "enough applicants for stock and receiving." *See id.* ¶¶ 370–71, 921. Ash's application, nonetheless, was accepted by Trytten. *Id.* ¶ 1122. Approximately five to ten minutes later, Place interviewed Ash, told her that she interviewed well, and passed her on for a second interview. *Id.* ¶¶ 1118–19, 1122. David Burke ("Burke"), director of operations, conducted Ash's second interview. *Id.* ¶¶ 179, 1122. Burke also informed Ash that she interviewed well, but that her application would be kept on file because the warehouse positions were filled. *Id.* ¶ 1123. Less than two weeks later, on July 2, 2004, Von Maur claims that Rockwell called Ash to offer her a warehouse position with Von Maur. *Id.* ¶ 1130; Pls.' Am. Statement of Material Facts ¶ 157. Rockwell, apparently, called Ash again on July 9, 2004. Def.'s Statement of Material Facts ¶ 1130. According to Von Maur, Ash never returned Rockwell's phone calls. *Id.* Von Maur, therefore, did not hire Ash because she did not call back, while Ash claims that she only received a standard regret letter. *Id.* ¶¶ 1130, 1136; Pls.' Am. Statement of Material Facts ¶ 157.

### 6. *La'Quan Miller.*

Von Maur has an executive training program which is designed to provide additional training for individuals interested in moving into executive management positions or to "buying" roles. *See* Def.'s Statement of Material Facts ¶ 7. Individuals interested in Von Maur's executive training program can apply through Von Maur's website, submit an application in person, be recruited on college campuses, or (presumably as a current employee) be identified as someone to enter the executive training. *See id.* ¶ 119. Individuals accepted into the executive training program are exposed to all responsibilities of a sales associate, go through new hire orientation, have additional training at the corporate office in the first months of employment, receive additional training by store management, work in the distribution center and the finance department, and "receive additional training on company philosophies, expectations, management philosophy, leadership, specific skills such as negotiations, and work with a buyer." *Id.* ¶ 120.

In late 2004, as Miller was preparing to graduate from college, he applied online at Von Maur Center for entry-level corporate positions, like the executive training program. *See* Pls.' Am. Statement of Material Facts ¶ 296. Specifically, Miller applied in October 2004, and again in November 2004, but did not hear back from Von Maur.[24] *See* Def.'s Statement of Material Facts ¶ 1162. Von Maur does not have a record of Miller's 2004 applications and claims that it did not have online application capacity until November 2004. *See id.* ¶¶ 1166–67. Von Maur also points out that on Miller's subsequent June 27, 2005[25]

---

**24.** Miller contends that he applied to Von Maur's Lombard, Illinois location at some point in 2004. Von Maur, however, claims it only has a record of Miller's Lombard application dated June 2005. Regardless, the parties agree that Miller's application to the Lombard store is not part of the current litigation. *See* Def.'s Br. at 121.

**25.** The Court notes that Miller's application to the Lombard store is not dated. *See* Def.'s App. at 1852. However, there is a handwritten notation on the application that it was screened on June 29, 2005, and on July 11, 2005, and the final notation states, "7–14–05 not interested." *Id.* at 1850.

application to its Lombard, Illinois store, Miller noted that he had not previously applied to Von Maur. *See* Def.'s App. at 1848.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is " 'not to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations; rather, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

■ Employment actions are inherently fact based, and the Eighth Circuit has repeatedly cautioned that in employment discrimination cases, summary judgment should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir.1998) (citations omitted); *see also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) ("summary judgment should seldom be used in employ-

ment-discrimination cases"); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.—W. Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)). This does not mean, however, that summary judgment is never proper in employment cases.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. LAW AND ANALYSIS

### A. *Statute of Limitations*

#### 1. *Title VII.*

■ The parties agree that any cause of action under Title VII which occurred prior to October 10, 2002 is barred by the applicable 300–day statute of limitations. *See* Def.'s Br. at 11; Pls.' Br. at 40. Despite this initial agreement, the parties dispute whether the claims asserted by certain Plaintiffs are barred. Von Maur contends that the causes of action asserted by Guy, Damenica Johnson, and Havilah Johnson are barred, while Plaintiffs counter that the claims by Guy, Damenica Johnson, and Havilah Johnson are timely.

As noted above, Guy applied to Von Maur's executive training program in the summer of 2000 and was not hired. *See* Def.'s Statement of Material Facts ¶¶ 751, 755–56. This claim, that Von Maur failed to hire Guy in the summer of 2000, is barred by the statute of limitations. Indeed, Plaintiffs state that they "are not seeking redress for incidents prior to [the October 10, 2002] date." Pls.' Response Br. at 40. Guy's subsequent claim, arising out of her June or July 2003 application, however, is not barred by the statute of limitations. Guy testified that she applied in June or July 2003 for Buyer and Buyer Assistant, in response to a newspaper advertisement announcing openings for "buying jobs." Pls.' Am. Statement of Material Facts ¶ 271. Von Maur does not contest that Guy filled out an application. *See* Def.'s Statement of Material Facts ¶ 775 ("Guy went to Von Maur's corporate headquarters and asked the receptionist for an application and was given an application, which she then filled out."). Rather, Von Maur contends that it does not have a record of Guy's application, and without it, "it is possible to assume Guy never applied or that the application was discarded under the one year document retention policy or that the application was facially defi-

cient or that Guy's very abbreviated employment previously with Von Maur was considered." *Id.* ¶ 776. Given Von Maur's acknowledgment that Guys filled out an application, and Guy's own testimony that she applied for Buyer and Buyer Assistant positions in June or July 2003, there is a genuine issue of material fact and the Court, therefore, cannot conclude as a matter of law that Guy's failure to hire claim arising out of the June or July 2003 application is barred by the statute of limitations. Accordingly, Guy's failure to hire claim stemming from her 2000 application is barred, while Guy's failure to hire claim arising from her June or July 2003 application is not barred by the statute of limitations.

Next, Von Maur argues that any claims asserted by Damenica Johnson arising from her alleged applications to Von Maur's credit department in 2001 and 2002 are barred by the statute of limitations. *See id.* ¶¶ 945–46. Again, Plaintiffs agree that they "are not seeking redress for incidents prior to [the October 10, 2002] date." Pls.' Response Br. at 40. Accordingly, because Plaintiffs do not dispute that Johnson's 2002 application occurred prior to October 10, 2002, any claims arising from Johnson's 2001 and 2002 applications are barred by the statute of limitations.[26]

Lastly, Von Maur contends that any claims asserted by Havilah Johnson are barred by the statute of limitations. As noted above, Havilah Johnson applied to Von Maur on three separation occasions. The parties agree that Johnson applied the first two times in 2001, first in approximately May 2001, and the second time a month later, in approximately June 2001. The parties dispute, however, the date of Johnson's third and final application. During her deposition, Johnson testified

that she applied all three times in 2001. *See* Def.'s App. at 762 ("Q: Okay, so in 2001, before June of 2001, you submitted three applications? A: I don't know the exact date, but it was in 2001."). Johnson, moreover, testified that she applied to Von Maur before she started working at Valley Shelter in 2001. *See id.* at 744, 762. Johnson's testimony, however, changed during subsequent questioning by Plaintiffs' counsel. That is, in response to Plaintiffs' counsel's question regarding the time frame of her third application, Johnson testified that it "was in the year of 2003." Pls.' App. at 871 ("Q: Okay. Now, the third time you applied to Von Maur what was that in response to? A: An ad in the paper. Q: And do you recall when you applied for that job? A: It was the year of 2003."). Johnson recalled the time frame because of the summer job she held during college, and that she "needed to find another job, and [she] applied to Von Maur the same time that [she] applied for Family Resources." *Id.* Johnson, however, testified that she started working at Family Resources in 2001. *See* Def.'s App. at 744 ("Q: When did you start working there? A: 2001."). Thus, even disregarding Johnson's earlier testimony, and making all reasonable inferences in favor of Plaintiffs at this stage in summary judgment, the Court cannot find that Johnson applied in 2003. Indeed, the point of reference that Johnson recalled to determine when she applied to Von Maur for the third time was that she applied to Family Resources during the same time period, which was in 2001. Accordingly, the Court concludes that Havilah Johnson's claims are barred by the statute of limitations.

### 2. *42 U.S.C. § 1981.*

In addition to the Title VII claims, Individual Plaintiffs also assert claims under

---

**26.** Von Maur does not contest the timeliness of Johnson's claim arising out of her June 10,

2003 application. *See* Def.'s Statement of Material Facts ¶ 947.

§ 1981. Von Maur states that because the two year statute of limitations applies to failure to hire cases under § 1981, Guy's claim arising out of her alleged summer 2000 application to the executive program, and Damenica Johnson's claim arising out of her applications to the credit department in 2001 and 2002 are barred. *See Williams v. Hawkeye Cmty. Coll.*, 494 F.Supp.2d 1032, 1042 (N.D.Iowa 2007). Again, Plaintiffs state that they are "not seeking redress for incidents prior to [the October 10, 2002] date." Pls.' Response Br. at 40. Accordingly, Guy's § 1981 claim arising out of her summer 2000 application and Johnson's § 1981 claim arising out of her 2001 application to the credit department are barred. As for Johnson's 2002 application, Plaintiffs do not argue that the claim is timely, and there is no indication in the record that the 2002 application was within the applicable limitations period. The Court, therefore, concludes that Johnson's § 1981 claim arising out of her 2002 application to the credit department is also barred by the statute of limitations.[27]

### B. Individual Plaintiffs' Indirect Evidence of Discrimination

 In their Fourth Amended Complaint, Individual Plaintiffs allege that Von Maur failed to hire them on the basis of their race in violation of Title VII, 42 U.S.C. § 1981, and the Iowa Civil Rights Act ("ICRA").[28] In its class action, the EEOC alleges that Von Maur failed to hire class members on the basis of their race in violation of Title VII.[29] A plaintiff may prove discrimination by using either direct or indirect (circumstantial) evidence. *See Putman v. Unity Health Sys.*, 348 F.3d 732, 734 (8th Cir.2003). Direct evidence of discrimination is rare because "there will seldom be eyewitness testimony as to the employer's mental processes because a shrewd employer will not leave a trail of direct inculpatory evidence for the plaintiff to bring into court." *EEOC v. Liberal R–II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir.2002) (internal citation and quotation omitted). A plaintiff, therefore, may prove discrimination by using indirect (circumstantial) evidence. Under the three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff must first demonstrate a prima facie case of intentional discrimination. If the plaintiff presents a prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. If the defendant meets that minimal burden, the burden then shifts back to the plaintiff to show that the defendant's proffered non-discriminatory reason is merely a pretext for unlawful discrimination. *See, e.g., Putman*, 348 F.3d at 735. Here, Von Maur argues that Plaintiffs cannot establish a prima facie case for race discrimination.

 To establish a claim for failure to hire on the basis of race, Plaintiffs must show, with respect to each Plaintiff that: (1) they are members of a protected class;

---

27. Havilah Johnson, as an EEOC class member, did not assert a § 1981 claim.

28. As noted above, Count IV (intentional infliction of emotional distress claim) of Individual Plaintiffs' Fourth Amended Complaint was dismissed with prejudice by stipulation of the parties. *See* Clerk's No. 52.

29. Although Individual Plaintiffs allege violations of Title VII, § 1981, and the ICRA, the analysis under Title VII and § 1981 are identical, and that analysis does not significantly differ for the ICRA. *See, e.g., Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997); *Parada v. Great Plains Int'l of Sioux City, Inc.*, 483 F.Supp.2d 777, 792 n. 3 (N.D.Iowa 2007). Accordingly, the Court will analyze all three claims together.

(2) applied and were qualified for the job for which Von Maur was seeking applicants; (3) were rejected; and (4) after they were rejected, Von Maur continued to seek applicants with Plaintiffs' qualifications. *Harrison v. United Auto Group,* 492 F.3d 972, 974 (8th Cir.2007).[30] Von Maur does not dispute the first element of the prima facie case, that the Plaintiffs are members of a protected class (African-American). Von Maur, however, disputes the remaining elements in some respect with each Plaintiff. The Court will address the remaining elements for each Plaintiff in turn.

### 1. *Ward's evidence of discrimination.*

On or about May 29, 2003, Ward, who was unemployed at the time, went to Von Maur Center to apply for employment. Ward applied for "any open position" at Von Maur. On May 30, 2003, Peterson interviewed Ward. Because there was an immediate need to fill open merchandise processor positions, Peterson only considered Ward for that position. Ward was not hired.

### a. *Prima facie case.*

■ Von Maur contends that Ward cannot establish the second element of the prima facie case, that Ward was qualified for the position. Ward contends that she was qualified for merchandise processor because she met the physical requirements of the position and there were no educational or experience requirements. Pls.' Response Br. at 46. Von Maur states that

Ward was not qualified for the position because, during the interview with Peterson, Ward could not state with certainty that she would be available for the hours required and had expressed that she had attendance problems in the past. Ward contends that Von Maur's explanations, based on subjective hiring criteria, are more accurately categorized as Von Maur's allegedly legitimate, non-discriminatory reasons for not hiring her, not a basis to refute Ward's qualifications for the position. The Eighth Circuit has noted that "a plaintiff's burden at the prima facie stage is less onerous where the employer's hiring criteria are subjective," as it pertains to the second element of the prima facie case. *See Harrison,* 492 F.3d at 974. Given that Von Maur has not pointed to an *objective* hiring criteria for which Ward did not qualify, the Court agrees with Plaintiffs' contention and finds that Ward was minimally qualified for the position. *See Lyoch v. Anheuser–Busch Cos., Inc.,* 139 F.3d 612, 615 (8th Cir.1998) ("This lighter burden at the prima facie stage is justified by the fact that subjective criteria for [hiring] 'are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.'" (citation omitted)). Because Von Maur does not dispute the third and fourth elements of the prima facie case, that Ward was rejected for the position and that Von Maur continued to seek applicants, the Court finds that Ward has satisfied her prima facie case.

---

30. The "Supreme Court and [the Eighth Circuit] have recognized that the prima facie case in discrimination suits varies somewhat with the specific facts of each case," especially the fourth element. *Hindman,* 145 F.3d at 990–91 (citing *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817). Specifically, in addition to the fourth element noted above, the Eighth Circuit and Iowa district courts have articulated the fourth element as, "the employer hired someone from outside the protected class," *see, e.g., Arraleh v. County of Ramsey,* 461 F.3d 967, 975 (8th Cir.2006), or "that the circumstances surrounding the employment decision give rise to an inference of unlawful discrimination." *Peterson v. Prosser,* No. C08–4005–MWB, 2008 WL 1836665, at *4, 2008 U.S. Dist. LEXIS 33581, at *15 (N.D.Iowa April 23, 2008).

b. *Pretext for discrimination.*

Because Ward satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. As noted above, Von Maur states that it did not hire Ward because, during her interview with Peterson, Ward could not state with certainty that she would be available for the hours required and had expressed that she had attendance problems in the past. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Ward to show that Von Maur's proffered nondiscriminatory reasons are merely a pretext for unlawful discrimination. To establish that Von Maur's stated reasons are pretext, Ward first points out that as to her availability, she wrote on her application that she was "open" to work every day of the week, with a designation of "morning" for Mondays. *See* Pls.' App. at 221. Peterson testified that Ward satisfied the availability requirement during her pre-interview screening process, otherwise, Peterson would not have interviewed Ward in the first instance. However, Peterson states that when she tried to re-confirm Ward's availability during the interview, Ward did not answer with certainty, but only answered that she "should be" or "probably could" be available for the required hours. *See* Def.'s App. at 1128.

Ward, on the other hand, testified that she was available for the required hours, and stated as much during the interview. Ward attempts to discredit Peterson's recollection of the interview by pointing out that Peterson testified that she was certain that she interviewed Ward *after* interviewing Renkosik, because Peterson recalled wanting Ward to do well on the interview because Renkosik, who worked with Ward at Oscar Mayer, was passed on for a second interview. It appears, however, that Peterson's work calendar showed that

Ward was interviewed first, *before* Renkosik was interviewed by Peterson. *See* Pls.' Am. Statement of Material Facts ¶ 82. The Court, however, does not make credibility determinations. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

█ Additionally, Ward argues that Von Maur is changing its reasons for not hiring Ward. Ward points out that "years ago," Von Maur informed the Davenport Civil Rights Commission that the "deciding factor" in not hiring Ward was that Ward told Peterson that Oscar Mayer fired her for missing work, while presently, in its motion for summary judgment, Von Maur contends that it did not hire her because she was not available for the required hours. These shifting explanations, according to Ward, demonstrate that Von Maur's explanations are pretext for discrimination. *See Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 847 (8th Cir.2006) ("A plaintiff may make a sufficient showing of pretext by ... showing that an employer ... made substantial changes over time in its proffered reason for an employment decision." (internal citations omitted)). The Court disagrees.

In its position statement to the Davenport Civil Rights Commission, Von Maur stated that a couple of "red flags" were raised during Ward's interview with Peterson. Specifically, Von Maur noted that Ward stated that her housekeeping job after her employment with Oscar Mayer was "ridiculous" and was worse than her job at Oscar Mayer, and that she wanted to bid on "easier" jobs at Oscar Mayer. *See* Pls.' App. at 638–39. According to Von Maur, these comments by Ward raised questions about her attitude. Von Maur stated in its position statement to the Davenport Civil Rights Commission that the "deciding factor," however, was Ward's comment that Oscar Mayer let her

go because she missed a lot of work. *Id.* at 639. Although Ward denies making that statement, the First Interview Questions sheet that Peterson filled out during the interview states, " 'Missed a lot of work [and] they [Oscar Mayer] let me go,' " in addition to, "Left Oscar Meyer [sic] 8/02 due to changing schedule (each week) conflicting [with] school schedule. She is now taking every classes [sic][and] looking [to increase] day shift position." *Id.* at 307. In its brief, Von Maur does address Ward's availability concern as one reason for not hiring her, but Von Maur continues to note that Ward's comment about her past attendance problems at Oscar Mayer was another reason for not hiring her. Here, Von Maur's emphasis on one reason for not hiring Ward (availability), where it appears that there were multiple "red flags" (attitude, attendance, easy job), does not demonstrate that Von Maur's nondiscriminatory reasons for not hiring Ward are pretext for discrimination. Accordingly, Ward has not satisfied her burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

### 2. *McBride's evidence of discrimination.*

McBride applied for employment at Von Maur Center on May 29, 2003. Within a couple of weeks, after not receiving any response, McBride participated in Von Maur Center's June 2003 open house. Although McBride had previously filled out an application, McBride was asked to complete another application because the receptionist could not locate McBride's May 29 application. After completing another application for merchandise processor, data entry, and customer service positions, McBride waited approximately twenty-five minutes and was interviewed by Bryan. McBride was not hired.

### a. *Prima facie case.*

Von Maur contends that McBride cannot establish the second element of the prima facie case, that McBride was qualified for the positions. McBride states that she was qualified for merchandise processor, data entry, and customer service positions. After review of the job descriptions, it appears that McBride's qualifications satisfy the objective experience and knowledge/skill requirements enumerated in the job descriptions. While Von Maur is certainly entitled, at trial, to rely on evidence that its subjective criteria and subjective impressions, free from any discriminatory animus, made McBride unqualified for merchandise processor, data entry, and customer service positions, at this stage in summary judgment, the Court finds that McBride met the minimum objective qualifications for the positions. *See Harrison,* 492 F.3d at 974 ("[A] plaintiff's burden at the prima facie stage is less onerous where the employer's hiring criteria are subjective."); *Lyoch,* 139 F.3d at 615 ("This lighter burden at the prima facie stage is justified by the fact that subjective criteria for [hiring] 'are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.' " (citation omitted)). Von Maur does not dispute the third element of the prima facie case, that McBride was rejected by Von Maur. Von Maur, however, disputes that McBride can satisfy the fourth element.[31] Von Maur, however, acknowledges that it continued to seek applicants for the open positions. *See* Def.'s Br. at 55. Accordingly, McBride has satisfied her prima facie case.

---

31. Von Maur analyzed the fourth element under a different standard, i.e., that the position was not filled by someone in the protected class, which differs from the fourth element noted above, that after Plaintiffs' were rejected, Von Maur continued to seek applicants with Plaintiffs' qualifications. *Harrison,* 492 F.3d at 974.

b. *Pretext for discrimination.*

Because McBride satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. As noted above, Von Maur states that it did not hire McBride because, during her interview with Bryan, McBride recounted an incident during her tenure as a dental assistant, when a "gay" man urinated all over the restroom and McBride refused to clean it up. Bryan, who happens to be a lesbian, found McBride's comment offensive and inappropriate and felt that McBride did not have the proper communication skills needed for the positions for which she applied. This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to McBride to show that Von Maur's proffered non-discriminatory reason is merely a pretext for unlawful discrimination.

■ To establish that Von Maur's reason is pretext for discrimination, McBride points to her testimony, wherein she testified that she never made any disparaging statement about gay people during the interview. The interview notes that Bryan took during McBride's interview, however, state, "dental asst—gay gentleman urinated all over restroom—refused to clean." Def.'s App. at 2289. It appears, therefore, that McBride did reference an incident involving a gay man during the interview, regardless of whether McBride considered the statement to be disparaging towards gay people. Bryan testified that she found McBride's comment to be offensive and inappropriate, and made the decision not to pass McBride for a second interview. The Eighth Circuit has repeatedly explained that employment discrimination laws "have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir.1995). Thus, in this case, even if the Court found that McBride's statement was not objectively disparaging against gay people, and that Bryan misconstrued McBride's statement, the Court still cannot conclude that Von Maur's explanation is pretext for discrimination. Indeed, employment discrimination laws "do not prohibit employment decisions based upon ... erroneous evaluations, personal conflicts between employees, or even unsound business practices." *Hill v. St. Louis Univ.,* 123 F.3d 1114, 1120 (8th Cir.1997); *see Arnold,* 471 F.3d at 847 (explaining that even when an employer makes an employment decision "upon a mistaken belief, the [plaintiff] still must offer some evidence that racial animus was at the root of the [employment decision]").

Next, McBride claims that Von Maur's "changes over time" in its proffered reason for not hiring her shows pretext. *See Arnold,* 471 F.3d at 847 ("A plaintiff may make a sufficient showing of pretext by ... showing that an employer ... made substantial changes over time in its proffered reason for an employment decision." (internal citations omitted)). Specifically, in Von Maur's answers to Plaintiffs' interrogatories in September 2005, Von Maur stated that it did not hire McBride because of her communication skills. *See* Pls.' App. at 175, 203. In February 2006, Von Maur amended its answer, stating that it did not hire McBride because Bryan "believed that Ms. McBride's frequent references to God during her interview were akin to proselytizing and that this would create problems in her communications with other employees." *Id.* at 236, 245. In January 2007, after Bryan testified that her decision not to pass McBride for a second interview was based upon McBride's comment about a gay man, not

McBride's alleged references to God, Von Maur filed another amended answer to Plaintiffs' interrogatories, stating that Bryan's "decision not to recommend McBride for a second interview was based in part on negative and offensive comments Ms. McBride made during her first interview regarding homosexuality." *Id.* at 248; Pls.' Am. Statement of Material Facts ¶ 174.

■ These alleged inconsistencies, according to McBride, demonstrate that Von Maur is offering a pretextual rationale for not hiring her. The Court disagrees. The Eighth Circuit explained that "[w]hile it is true that substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext, this does not mean that an employer cannot elaborate on its proffered reason." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir.2005) (internal citation and quotation omitted). Here, Von Maur has not substantially changed its proffered reason for not hiring McBride. Rather, Von Maur maintained from the start that it had concerns over McBride's communication skills—and during the course of discovery merely amended the reason for its concern. *See Engstrand v. Pioneer Hi–Bred Int'l, Inc.*, 946 F.Supp. 1390, 1400 (S.D.Iowa 1996) (finding no shifting reasons for termination where, of the twenty three reasons listed for plaintiff's dismissal in defendant's first answer to plaintiff's interrogatories, sixteen remained and were encompassed in the scope of the amended answer). This is not a case of Von Maur changing its story. *See generally Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir.1994) (noting substantial change in employer's reason for employment decision where employer hired an applicant for his expertise in psychoanalysis while stating plaintiff's expertise was too focused on psychoanalysis). Accordingly, McBride has not satisfied her burden of establishing

pretext under the *McDonnell Douglas* burden-shifting framework.

### 3. *Gardner's evidence of discrimination.*

On May 29, 2003, Gardner completed an application for employment with Von Maur Center. Within a couple of weeks, after not receiving any response, Gardner participated in Von Maur Center's June 2003 open house. Although Gardner had previously filled out an application, Gardner was asked to complete another application because the receptionist could not locate her May 29 application. After completing another application for open warehouse positions, Gardner was interviewed by Haun. Gardner, however, was not hired.

#### a. *Prima facie case.*

Von Maur contends that Gardner cannot establish the second element of the prima facie case, that she was qualified for the positions. Gardner contends that she was qualified for the open warehouse positions. It appears that Gardner's qualifications satisfy the objective requirements of the warehouse positions. Again, as noted above, while Von Maur is entitled, at trial, to rely on evidence that its subjective criteria and subjective impressions, free from any discriminatory animus, made Gardner unqualified for the warehouse position, at this stage in summary judgment, the Court finds that Gardner met the minimum objective qualifications for the positions. *See Harrison*, 492 F.3d at 974 ("a plaintiff's burden at the prima facie stage is less onerous where the employer's hiring criteria are subjective"); *Lyoch*, 139 F.3d at 615 ("This lighter burden at the prima facie stage is justified by the fact that subjective criteria for [hiring] 'are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.'" (cita-

tion omitted)). Von Maur does not dispute the third element of the prima facie case, that Gardner was rejected by Von Maur. As to the fourth element of the prima facie case, the Court finds that Gardner satisfied this element because Von Maur acknowledges that it continued to seek applicants for the open positions. *See* Def.'s Br. at 58. Accordingly, Gardner has satisfied her prima facie case.

b. *Pretext for discrimination.*

Because Gardner satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. Von Maur states that it did not hire Gardner because Haun, who interviewed her, had concerns over Gardner's longevity with Von Maur given her employment history. This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to Gardner to show that Von Maur's proffered non-discriminatory reason is merely a pretext for unlawful discrimination. Gardner contends that Von Maur's reason is pretext for discrimination because Von Maur hired Caucasian applicants who had worked less than one year with an employer, while Gardner had eighteen months of continuous employment at Staples working part-time. Specifically, Gardner points to Joanna Wakeland, who did not have continuous employment for a year, Michelle Niemi–Hirst, who only worked for three previous employers for a month or two, Jill North, who did not have continuous employment for a year, Rachel Cagle, who did not have more than thirteen months of continuous employment, and Dina Erxleben, who did not have continuous employment for two years. *See* Pls.' Response Br. at 12.

Von Maur, however, explains that it does not maintain a rigid requirement for a certain number of continuous years in employment with a single employer for an applicant to be deemed a long-term hire.

Rather, Von Maur acknowledges that determining longevity of an applicant is a subjective criteria which is based on the totality of the applicant's circumstance. *See* Def.'s Reply App. at 16–17 ("Q: And I guess I wanted an explanation as to how having ten months at one job and a year and a half at another job does not demonstrate longevity.... A: I [Haun] think as we kind of discussed that longevity issue yesterday, you really look at the complete application and the positions that [the applicant] had, more of a set responsibility [the applicant] was at...."). For instance, Von Maur states that Jill North, noted above, recently graduated from high school and therefore her employment history consisted only of short-term summer jobs. Moreover, North was recommended by Rockwell's brother-in-law. *See* Def.'s Reply Br. at 34. While Gardner had various positions lasting from a little over a month to eighteen months, and she did not have a special recommendation. *See* Def.'s Statement of Material Facts ¶ 565. Von Maur, moreover, points to Jacqueline Gray, an African–American applicant who was hired, despite not having employment with the same employer for a year. *See* Def.'s App. at 1351–52. Thus, Von Maur contends that the longevity criteria, which admittedly is subjective, is not applied in a discriminatory manner. In Gardner's case, Haun believed that Gardner's employment history, coupled with Gardner's response that she would like to attend beauty school in the future, did not make her likely to be a long-term hire.

As noted above, employment discrimination laws "have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson*, 63 F.3d at 781.

Here, even assuming that Haun was completely mistaken in her longevity concern with Gardner, and Gardner, in fact, would have worked at Von Maur long-term if she was hired, the Court still cannot conclude that Von Maur's explanation is pretext for discrimination. Indeed, employment discrimination laws "do not prohibit employment decisions based upon ... erroneous evaluations ... or even unsound business practices." *Hill*, 123 F.3d at 1120; *see Arnold*, 471 F.3d at 847 (explaining that even when an employer makes an employment decision "upon a mistaken belief, the [plaintiff] still must offer some evidence that racial animus was at the root of the [employment decision]"). Given that Von Maur hired both Caucasian and African–American applicants with more short-term employment backgrounds, assessing longevity in context of that applicant's situation, the Court cannot conclude that Von Maur's reason for not hiring Gardner is pretext for discrimination. Accordingly, Gardner has not satisfied her burden under the *McDonnell Douglas* burden-shifting framework.

#### 4. *Williams' evidence of discrimination.*

On or about June 23, 2003, Williams participated in Von Maur Center's open house. Williams applied for the open warehouse positions and was interviewed by Davis. Due to longevity concerns, Davis did not pass Williams for a second interview. The following year, Williams again participated in Von Maur Center's June 2004 open house. Williams applied for the open warehouse positions on June 22, 2004, the second day of the open house. Bryan interviewed Williams for approximately five minutes. Williams was not hired.

##### a. *Prima facie case.*

■ Von Maur contends that Williams cannot establish the second element of the prima facie case, that he was qualified for the positions. Williams states that he was qualified for the warehouse positions that he applied for in June 2003 and June 2004. Von Maur contends that Williams was not qualified because Von Maur had longevity concerns. As discussed above, this subjective criteria is more appropriate for the pretext analysis. Accordingly, the Court finds that Williams met the objective criteria for the warehouse positions and was, therefore, minimally qualified. *See Harrison*, 492 F.3d at 974 ("[A] plaintiff's burden at the prima facie stage is less onerous where the employer's hiring criteria are subjective."). Because Von Maur does not dispute the third and fourth elements of the prima facie case, that Williams was rejected for the positions and that Von Maur continued to seek applicants, the Court finds that Williams has satisfied his prima facie case.

##### b. *Pretext for discrimination.*

■ Because Williams satisfied his prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring Williams. Von Maur states that it did not hire Williams in 2003 because Davis, who interviewed him, had concerns over Williams' likely longevity with Von Maur, given his employment history and his interest in pursuing a radiology degree. This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to Williams to show that Von Maur's proffered nondiscriminatory reason is merely a pretext for unlawful discrimination. Williams contends that Von Maur's reason is pretext because Von Maur made substantial changes over time in its proffered reasons for an employment decision. *See Arnold*, 471 F.3d at 847.

###### 1. *June 2003 application.*

Specifically, Williams points to Von Maur's April 2005 position statement to

the Davenport Civil Rights Commission, where Von Maur stated that it did not hire Williams because of concerns with "how long he would stay on the job since he intended to go to school to obtain a position in the medical field." Pls.' App. at 65. In April 2008, however, Von Maur amended its answers to interrogatories to state that Von Maur did not hire Williams "because of concerns about his possible longevity with Von Maur." *See* Pls.' App. at 627, 629. This alleged inconsistency, according to Williams, demonstrates that Von Maur is offering a pretextual rationale for not hiring him. The Court disagrees. Von Maur's reason for not passing Williams to a second interview was its concern with his longevity. The fact that Von Maur's position statement specifies Williams' intention to attend school in the future as the cause for its longevity concern, while its amended answers to Plaintiffs' interrogatories provides the more generic "longevity" as a reason for not hiring Williams, does not amount to a substantial change in Von Maur's proffered reason.

Next, Williams points to Caucasian candidates that were hired despite their intentions to pursue education in the future. *See* Pls.' Response Br. at 11. Bryan and Peterson both testified that an applicant who is currently attending school or who plans to attend school in the future is not automatically disqualified from a position, but rather would warrant a follow-up about the applicant's availability. *See* Pls.' App. at 700–01, 971. In Williams' case, it is unclear from the record if Davis followed-up about Williams' availability. However, even assuming that Williams did, in fact, assure Davis about his availability to work the warehouse positions, Davis states that after consulting with either Rockwell or Bryan about her longevity concerns with Williams, that either Rockwell or Bryan informed Davis that they had a number of candidates without longevity concerns. Thus, given that

Williams applied during Von Maur's open house, Von Maur had ready access to a pool of applicants that did not pose any longevity concerns. *See* Def.'s Statement of Material Facts ¶ 910. Indeed, it may very well be that had Williams applied prior to or after the open house, he may have been hired despite Davis' initial longevity concerns. However, Williams applied with a large number of applicants during the open house, where Von Maur presumably had access to more applicants—both qualified and unqualified—than usual. *See* Pls.' App. at 58 (Von Maur had "hundreds" of applicants that applied just on the second day of the open house). Thus, Von Maur decided not to pass Williams on for a second interview because it had a pool of applicants who did not pose longevity concerns. Accordingly, Williams has not demonstrated that Von Maur's reason for not hiring him in June 2003 is pretext for discrimination.

### 2. *June 2004 application.*

As for Williams' June 2004 application, Von Maur states that it did not hire Williams in 2004 because the positions were already filled and Bryan, who interviewed him, had concerns over Williams' longevity. Williams contends that Von Maur's reasons are pretext for discrimination because Von Maur made substantial changes over time in its proffered reasons. *See Arnold,* 471 F.3d at 847. Williams states that in its April 2005 position statement to the Davenport Civil Rights Commission, Von Maur stated that it did not hire Williams because the warehouse positions, specifically the stock and receiving positions, were filled. *See* Pls.'s App. at 66–68. Subsequently, Von Maur filed a supplemental position statement explaining that while the receiving and stock positions were filled, Williams was considered for the merchandise processing position, a warehouse position which was still open on

the second day of the open house. *See id.* at 57–59. Even though Williams was considered for the merchandise processing position, Von Maur stated in its position statement that Bryan decided not to pass Williams for a second interview because of the "incomplete and sloppy" status of his application, which is inconsistent with the "attention to detail" quality sought in merchandise processing applicants. *See id.* at 58–59. Von Maur, additionally, stated that Bryan also had concerns about Williams' longevity given his employment history. *See id.* at 58–59.

Moreover, in its answers to Plaintiffs' interrogatories, Von Maur stated that Williams "was not offered a second interview based upon how he completed his application, which showed a lack of attention to detail." *Id.* at 176. Bryan, however, testified that there was nothing about Williams' application, in and of itself, that would have prevented him from being hired as a merchandise processor. *See id.* at 711–12. That is, the "incomplete and sloppy" status of Williams' application would not have prevented Williams from getting the merchandise processor position. *See id.* at 712 ("Q: Okay. And you twice testified earlier that there was nothing in his application that should have prevented him from getting a merchandise processing position, correct? A: Correct."). Even after Bryan's testimony on January 30, 2007, Von Maur continued to maintain in its April 11, 2008 amended answers to Plaintiffs' interrogatories that Williams was not hired "because of questions about his longevity with his previous employers and his manner of completing his application." *See id.* at 627–28, 693. Presently, however, Von Maur only contends that Williams was not hired because of longevity concerns. Based on the record, it appears that Von Maur's statement that it declined to hire Williams based on his "incomplete and sloppy" application is false and a substantial change from its

current reason for declining to hire Williams—concerns over his longevity. *See id.* at 712. Accordingly, a rational trier of fact could find Von Maur's varying reasons for not hiring Williams are evidence of pretext. *See generally EEOC v. Wal–Mart Stores, Inc.,* 477 F.3d 561, 570 (8th Cir.2007) (stating that "false or shifting reasons support a finding of illegal motivation" (citation omitted)); *Peterson v. Scott County,* 406 F.3d 515, 522 (8th Cir. 2005) (noting that a jury could reject the employer's proffered reason because there was conflicting evidence on its believability); *Bassett v. City of Minneapolis,* 211 F.3d 1097, 1107 (8th Cir.2000) ("[I]f the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination."). Williams, therefore, has satisfied his burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework for his 2004 application.

### 5. *Donelson's evidence of discrimination.*

Donelson participated in Von Maur Center's June 2004 open house. Donelson applied for stock or shipping and receiving positions on the second day of the open house. After the first day of the open house, however, Von Maur states it had enough applicants for the stock and shipping and receiving positions. Donelson, nonetheless, was interviewed by Haun, who retained his application on active status for future openings for stock and shipping and receiving positions. Von Maur did not contact Donelson.

#### a. *Prima facie case.*

Von Maur does not dispute that Donelson can satisfy the second and third element of the prima facie case, that he was

qualified for the warehouse positions and that he was rejected by Von Maur. Von Maur, however, claims that Donelson cannot establish the fourth element, that after he was rejected, Von Maur continued to seek applicants. Specifically, Von Maur contends that it did not hire any applicants for stock or for shipping and receiving positions until July 18, 2005, approximately a year after Donelson applied, and more than six months after Donelson's application became inactive. In support, Von Maur points to a document listing the hire dates of employees in "Stock & Receiving" positions. *See* Def.'s App. at 2240. The chart shows that all current employees in the "Stock & Receiving" were hired on or before June 21, 2004, one was hired on July 12, 2004, and the rest were hired on or after July 18, 2005. *See id.* As for the applicant hired on July 12, 2004, Jesse Green, he applied and was interviewed on June 21, 2004. *See id.* at 1348. Von Maur, however, acknowledges that the merchandise processing position in the warehouse department was still open after June 21, 2004.

To satisfy the fourth element, Donelson points to other Caucasian applicants who were hired for open warehouse positions on or after June 22, 2004. *See* Pls.' Am. Statement of Material Facts ¶ 95. Indeed, based on the "Warehouse Hires 06/01/03 to 6/01/05" chart, Von Maur did hire Caucasian applicants, as noted by Donelson, on or after June 22, 2004. *See* Pls.' App. at 51–52. The chart, however, does not specify what positions the Caucasian applicants were hired into within the warehouse department ("stock and receiving" or merchandise processing), nor does Donelson argue that these applicants were hired into the "Stock & Receiving" positions rather than the open merchandise processing position. It appears, therefore, that Donelson is correct to assert that Caucasian applicants were subsequently hired into the *warehouse* department after he was

rejected, but that no applicants were hired for the "Stock & Receiving" positions until almost a year later, as asserted by Von Maur. Accordingly, Donelson has not satisfied the fourth element as to the stock and shipping and receiving positions, but has satisfied the fourth element as to the merchandise processing position.

b. *Pretext.*

Because Donelson satisfied his prima facie case for the merchandise processing position, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring Donelson for the merchandise processing position. Von Maur states that it did not hire Donelson for the entry-level position of merchandise processing because he was overqualified. Specifically, Von Maur states that, given Donelson's extensive supervisory experience, he was not well suited for the entry-level merchandise processing position. Def.'s Br. at 62–63. This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to Donelson to show that Von Maur's proffered non-discriminatory reason is pretext for discrimination.

Donelson contends that Von Maur's reason is pretext for discrimination because Von Maur made substantial changes over time in its proffered reason. *See Arnold,* 471 F.3d at 847. That is, Von Maur initially stated that Donelson was not hired because the positions were filled, then changed its reason to Donelson being overqualified for the position. However, once the Court distinguishes Von Maur's reasons for not hiring Donelson for the two distinct positions of stock and shipping and receiving versus merchandise processing, both of which are in the warehouse department and referred to as "warehouse positions," Donelson does not provide any evidence that Von Maur's reason for not

hiring him for the merchandise processing position is pretext for discrimination. *See Robinson v. Potter,* 453 F.3d 990, 994 (8th Cir.2006) (stating that not hiring an applicant for being overqualified is a legitimate, non-discriminatory reason). Accordingly, Donelson has not satisfied his burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

6. *Haymon's evidence of discrimination.*

On or about August 12, 2004, Haymon applied for a truck driver position with Von Maur Center. Bealer, responsible for hiring truck drivers, received Haymon's application and asked Turner and Morgan, two current Von Maur truck drivers who used to work with Haymon, what they thought of him. Both stated that Haymon was a nice guy, but that he was on the slower side. Bealer did not interview Haymon and he was not hired for the open truck driver position.

a. *Prima facie case.*

Von Maur contends that Haymon cannot establish the second element of the prima facie case, that he was qualified for the truck driver position. Haymon states that he was qualified for the truck driver position. Specifically, Von Maur contends that Haymon was not qualified because he "had a history of being unable to timely complete his deliveries." Def.'s Br. at 87. Bealer, the Traffic Manager who would have interviewed Haymon, however, testified that, based on Haymon's application, he was minimally qualified for the truck driver position. Pls.' App. at 686 ("Q: Based on your review of this application, is Mr. Haymon minimally qualified for the position of truck driver at Von Maur? A: Yes."). Accordingly, the Court finds that Haymon was qualified for the position. Because Von Maur does not dispute the third and fourth elements of the prima facie case, that Haymon was rejected for

the position and that Von Maur continued to seek applicants, the Court finds that Haymon has satisfied his prima facie case.

b. *Pretext.*

Because Haymon satisfied his prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring him. Von Maur states that it did not hire Haymon because when Bealer asked current Von Maur truck drivers, Morgan and Turner, both of whom had previously worked with Haymon at Eagle Foods, what they thought about Haymon as a truck driver, they both expressed concern over Haymon's timeliness in completing deliveries. Based on this information, Bealer decided not to interview or hire Haymon. This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to Haymon to show that Von Maur's proffered non-discriminatory reason is pretext for discrimination.

To satisfy his burden to demonstrate pretext, Haymon points to the fact that Morgan did not tell Bealer that she (Morgan) thought that Haymon was a slow driver. Specifically, Haymon notes that Morgan testified that she told Bealer that Haymon had a perfect driving record and that she highly recommended that Von Maur hire Haymon. *See id.* at 927. Indeed, it appears that Morgan thought Haymon was a good person, with a perfect driving record, and recommended him "highly" to Bealer. Morgan, however, also testified that she told Bealer that Haymon was a slower driver than she was. Def.'s App. at 963. Although Morgan may have explained to Bealer that she (Morgan) was "hyper" and, therefore, might work faster than Haymon, the fact remains that Morgan did tell Bealer that Haymon "drives slower than me, and he moves slower than me." *Id.* at 967. Thus, Morgan's testimo-

ny shows that she did tell Bealer that she thought Haymon was a slow driver, at least compared to herself.

Next, Haymon claims that Turner did not tell Bealer that Von Maur should not hire Haymon, and that Turner even testified that if Turner owned a trucking company, he would hire Haymon. Pls.' Response Br. at 24. Turner, indeed, did not tell Bealer not to hire Haymon. *See* Def.'s App. at 1529. Rather, Turner informed Bealer that Haymon was "never in a hurry [and that] he didn't move very fast." *Id.* at 1518. Turner also told Bealer that she may encounter the same problem with Haymon that she had with Matt Costello, a former Von Maur truck driver that took an hour or two longer than other drivers to get the deliveries done. *See id.* at 1528–29. In essence, Turner conveyed to Bealer his concerns that Haymon, although the nicest guy in the world, was going to "take [a] long" in completing deliveries. *See id.* at 1517, 1532. Finally, in terms of whether Turner would hire Haymon if he had his own trucking business, Turner testified that he would maybe hire Haymon "if it was a job that wasn't so time critical," but that if it was "a job where he had to be somewhere at a certain time, I don't know if I would hire him." *Id.* at 1533. Thus, Turner's testimony shows that he did tell Bealer that he thought Haymon was a slow driver. Haymon, therefore, has not demonstrated that Von Maur's reason for not hiring Haymon was pretext for discrimination. *See Hutson*, 63 F.3d at 781 (explaining that courts do not review the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination). Accordingly, Haymon has not satisfied his burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

### 7. *Smith's evidence of discrimination.*

On September 16, 2004, Smith applied in-person for an open truck driver position. Smith was briefly interviewed by Place and Bealer when he submitted his application. Pursuant to Von Maur policy, it ran a credit check on Smith. Based on the credit information, Smith was not hired.

#### a. *Prima facie case.*

Von Maur contends that Smith cannot establish the second element of the prima facie case, that he was qualified for the truck driver position. Smith states that he was qualified for the position because, at the time of his application, he had over thirty years of truck driving experience. Von Maur contends that Smith was not qualified for the truck driver position because he did not pass a credit check, required of all truck driver applicants. Von Maur's position description for a truck driver, however, does not mention passing a credit check as a qualification for the position. Von Maur, moreover, acknowledges that credit checks are performed on truck driver applicants only "if Von Maur is interested in further considering the candidate for employment." Def.'s Br. at 73. It is difficult for the Court to imagine that Von Maur, or any employer for that matter, would further consider an applicant for employment who was not at least minimally qualified for the position. Smith not passing the credit check, therefore, appears to be the reason that Von Maur decided not to hire Smith, rather than a factor affecting Smith's qualifications. Accordingly, the Court finds that Smith was minimally qualified for the truck driver position. Because Von Maur does not dispute the third and fourth elements of the prima facie case, that Smith was rejected for the position and that Von Maur continued to seek applicants, the Court finds

that Smith has satisfied his prima facie case.

### b. *Pretext.*

Because Smith satisfied his prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring him. Von Maur states that it did not hire Smith because his credit report came back with derogatory information, including back taxes totaling six figures, and because Smith did not call Von Maur to explain the derogatory information. That is, after receiving the credit report, Haun forwarded the report to Smith and wrote, "[i]f there is any information on the credit report that is inaccurate or that you would like to contact us to explain, please feel free to give me a call ... [w]e plan to make our final hiring decision in approximately one week." Def.'s App. at 1462. This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to Smith to show that Von Maur's proffered non-discriminatory reason is pretext for discrimination.

Smith contends that Von Maur's reason for not hiring him is pretext for discrimination because Von Maur's reasons have changed over time. Smith notes that Von Maur initially stated that he was not hired because he did not contact Haun to explain the derogatory information in his credit report, then Von Maur "changed" its reason and stated that it did not hire Smith because he had derogatory information on his credit report, including tax liens. The Court disagrees. Von Maur maintains that it did not hire Smith because he had derogatory information in his credit report, and Haun, not hearing from Smith, presumed that the information on the report was accurate. Based on the derogatory information, Haun made the decision not to hire Smith. This is not a case of shifting rationales. Indeed, Von Maur has not changed its proffered reason for not hiring Smith.

Next, Smith claims that he attempted to contact Haun on three different occasions after he received her letter, but that it was Haun who never returned Smith's calls. Smith states that had he made contact with Haun, he would have explained that the tax liens resulted from a time when he was self-employed as a truck contractor, that one of his cellular phone bills was incorrect, that he was making payments for the other cellular phone bills, that he had retained an attorney to deal with the issues on his credit report, and that he wanted to be given a chance. Pls.' Response Br. at 22. Von Maur, however, claims that Haun did not receive Smith's messages, and that even if it had, Smith's explanations would not have excused the derogatory information. That is, Smith did not have acceptable excuses such as divorce, health care bills, or incorrect credit information that would account for all the derogatory information on his credit report. *See* Def.'s Br. at 76. As noted above, employment discrimination laws "do not prohibit employment decisions based upon ... erroneous evaluations ... or even unsound business practices." *Hill*, 123 F.3d at 1120.

Lastly, Smith contends that Von Maur's reason for not hiring him is pretext for discrimination because Von Maur hired a Caucasian applicant, Michael Fahringer ("Fahringer"), for a Loss Prevention position even though Fahringer had derogatory information on his credit report. *See* Pls.' Response Br. at 23. Von Maur states that Fahringer is not comparable to Smith because Fahringer contacted Haun and sent a letter with documentation explaining that "his student loans were in deferment prior to the derogatory credit report, the car payments had been made prior to the derogatory credit report, and the [cel-

lular phone] invoice was a mistake." Def.'s Reply Br. 44. These explanations and the corresponding documentation satisfied Von Maur that Fahringer's credit report contained "inaccurate and erroneous information and that he was not delinquent on the reported accounts." *Id.* Smith, on the other hand, acknowledged that the derogatory information in his credit report was accurate. Moreover, the explanations Smith would have provided to Haun, had he been able to reach her, would not have been satisfactory to excuse the derogatory information. *See Hutson,* 63 F.3d at 781 (stating that courts do not sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers). Smith, therefore, has not demonstrated that Von Maur's reason for not hiring him was pretext for discrimination. Accordingly, Smith has not satisfied his burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

8. *Young's evidence of discrimination.*

Sometime between May and the end of 2003, Young saw a newspaper advertisement stating that Von Maur was hiring for warehouse, data entry, and clerical jobs. In response, Young went in-person to Von Maur Center to fill out an application for all three positions. A couple of weeks later, Young received a rejection letter stating that all the positions were filled. Young, however, claims that she continued to see advertisements for open warehouse positions.

a. *Prima facie case.*

■ Young contends that she established her prima facie case because she applied and was qualified for the positions, that she was rejected by Von Maur, and that Von Maur continued to seek applicants. Von Maur, however, claims that Young cannot establish her prima facie case because there is no evidence that Young even applied to Von Maur, and that even if she had, there is no evidence that Von Maur continued to seek applicants. First, as to whether Young even applied for a position, Von Maur states that pursuant to its record retention policy, all 2003 applications were maintained once it had notice of the present litigation. Von Maur, however, does not have Young's 2003 application. This missing application, according to Von Maur, is evidence that Young did not apply. Despite its argument, Von Maur admits that "Young went to Von Maur headquarters, asked for and was given an application, which she filled out and returned to the person who had given her the application." Def.'s Statement of Material Facts ¶ 722. Von Maur goes on to admit that "Young called Von Maur [a couple of days later] to inquire about the status of her application and was told that Von Maur was still reviewing applications." *Id.* ¶ 724. Then, "[a] week later, [Young] called Von Maur and was told someone would get back to her." *Id.* ¶ 725. Given Von Maur's own statement of material facts, and despite its arguments to the contrary, the Court finds that Young applied for open positions sometime in 2003. Next, Von Maur contends there is no evidence that it continued to seek applicants after it rejected Young. Young, however, points to Von Maur's 2001–2006 employee chart to demonstrate that Von Maur continued to seek and hire applicants after it rejected Young. *See* Pls.' App. at 432–465. Although it is unclear from the chart what departments correspond with the positions that Young applied for in 2003, Von Maur does not dispute Young's assertion. *See* Def.'s Reply Br. at 46–47. Accordingly, the Court finds that Young satisfied her prima facie case.

b. *Pretext.*

■ Because Young satisfied her prima facie case, the burden shifts to Von

Maur to articulate a legitimate, non-discriminatory reason for not hiring Young. Von Maur now contends that it did not hire Young because it did not receive an application from Young or that it lost her application. *See* Def.'s Reply Br. at 47; Def.'s Br. at 80. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Young to show that Von Maur's proffered non-discriminatory reasons are pretext for discrimination.

■ With regard to Young's burden, the Court first notes that Von Maur's own statement of facts admit that Young applied for positions at Von Maur, that a couple of days later, Young was told by Von Maur that applications were being considered, and that Young was told a week later that someone would get back to her. Von Maur cannot now claim in good faith that it lost her application or never received an application from Young. Indeed, Von Maur admitted that Young filled out an application. Def.'s Statement of Material Facts ¶ 722. Von Maur, moreover, admitted that it informed Young in a regret letter that she was not hired because the position was filled. *Id.* ¶ 726 ("About a week later, Young received a letter from Von Maur advising that the position was filled; Young did not retain a copy of this letter."). This statement of fact by Von Maur is, again, inconsistent with Von Maur's asserted reason for not hiring her, i.e., that it did not receive an application from Young or that it lost her application. Here, Von Maur does not account for its changing reasons for not hiring Young—from the position(s) being filled to Von Maur losing Young's application. *See Arnold,* 471 F.3d at 847 ("A plaintiff may make a sufficient showing of pretext by . . . showing that an employer . . . made substantial changes over time in

its proffered reason for an employment decision." (internal citations omitted)); *Kobrin,* 34 F.3d at 703 ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."). Accordingly, a rational trier of fact could find Von Maur's varying reasons for not hiring Young are evidence of pretext. Young, therefore, has satisfied her burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

9. *Damenica Johnson's evidence of discrimination.*

■ Johnson applied for credit, sales audit, and invoice keyer positions on June 10, 2003,[32] after seeing an advertisement for the positions. Nemmers, who took Johnson's application, informed Johnson that there were quite a few openings in the credit department, and that someone would be in touch with her. Johnson called on three occasions to follow-up on her application and was told that the application was still being reviewed, and then that the positions were filled. Johnson, however, claims that she continued to see advertisements for the positions.

a. *Prima facie case.*

Von Maur contends that Johnson cannot establish the second element of the prima facie case, that she was qualified for the open positions. Specifically, Von Maur states that Johnson was not qualified based on her availability. That is, Johnson's application states that she was available to work "5 to close" Mondays to Fridays, "open to close" on Saturdays, and a hyphen for Sundays. According to Von Maur, the positions that Johnson applied for did not accommodate the availability noted on her application. However, as

---

**32.** As noted above, Johnson's 2001 and 2002 applications are barred by the statute of limi-

tations. Accordingly, the Court will limit its analysis to Johnson's 2003 application.

discussed in detail below, Nemmers, the human resources assistant responsible for screening the applications, testified that the available hours that an applicant notes on an application "would not automatically disqualify them from the position" if the hours were inconsistent with what the position required. *See* Pls.' App. at 945. Accordingly, at least for purposes of the screening process, it does not appear that the available hours noted on the application itself serve to automatically disqualify an applicant from consideration. Accordingly, the Court finds that Johnson satisfied her prima facie case.[33]

### b. *Pretext.*

 Because Johnson satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. Von Maur states that it did not hire Johnson because Johnson was not available for the hours required for the positions. Specifically, Von Maur contends that the sales audit and invoice keyer positions are both full-time positions, and did not accommodate the availability that Johnson noted on her application. As for the credit department position, Von Maur states that it is also a full-time position, and the one credit department position with night and weekend hours requires occasional Sunday work, which precluded Johnson from consideration, given the availability on her application. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Johnson

to show that Von Maur's proffered non-discriminatory reasons are pretext for discrimination.

 Johnson contends that Von Maur's reasons for not hiring her are pretext for discrimination because Von Maur deviated from its screening practice. That is, Nemmers' "normal practice" during the screening process is to call an applicant to verify availability if the hours on the application did not match the position's requirement. *See* Pls.' App. at 944, 950. Nemmers' testified: "The times that [applicants] put on their application would not automatically disqualify them from the position if it was not verified with them that they could not work at other times." *Id.* at 945. Stated differently, the availability listed on the application is "not going to keep [the applicant] from getting an interview or talking to a person." *Id.* at 944–45. Here, Johnson claims that despite Nemmers' "normal practice" of calling applicants to verify availability, Nemmers did not contact Johnson. Indeed, Nemmers testified that she did not recall contacting Johnson. *See id.* at 949. Johnson, moreover, points to other Caucasian applicants who were hired despite the fact that their listed availability did not match up with the positions sought. *See* Pls.' Am. Statement of Material Facts ¶ 327. It appears then, that Nemmers did not follow her "normal practice" in screening Johnson's application. A reasonable jury, therefore, could reject Von Maur's proffered reason for not hiring Johnson, given that Nemmers testified that avail-

---

33. Von Maur argues for the first time in its reply brief that Johnson cannot satisfy the fourth element of the prima facie case. *See* Def.'s Reply Br. at 58. Because Von Maur did not raise this argument in its opening brief, the Court need not and will not consider it. *See, e.g., South Dakota Mining Assoc., Inc. v. Lawrence County,* 155 F.3d 1005, 1011 (8th Cir.1998) (stating that issues not argued in an opening brief cannot be raised for the

first time in a reply brief); *Torgeson v. Unum Life Ins. Co. of Am.,* 466 F.Supp.2d 1096, 1121 (N.D.Iowa 2006) ("Ordinarily, inclusion of a new argument in a reply brief is improper as a matter of motion practice in this court, and indeed, in this circuit." (internal citations omitted)); L.R. 7(g) (stating that a reply brief may be filed "to assert newly-decided authority or to respond to new and unanticipated arguments").

ability listed on the application alone would not automatically disqualify an applicant, whereas that is precisely the reason Von Maur articulates for not hiring Johnson. *See Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1110 (8th Cir.1994) (noting that a jury could reject the employer's proffered reason because there was conflicting evidence on its believability); *see also Bassett*, 211 F.3d at 1107 ("[I]f the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination."). Johnson, therefore, has satisfied her burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework. *See Arnold*, 471 F.3d at 847 ("[a] plaintiff may make a sufficient showing of pretext by ... showing that an employer ... failed to follow its own policies").

### 10. *Guy's evidence of discrimination.*

Guy applied for "buyer" positions, Buyer and Buyer Assistant, in June or July 2003.[34] According to Von Maur, if an applicant applies for the Buyer Assistant position, but aspires to become a Buyer, Von Maur would inform the applicant that the most direct path to becoming a Buyer is to first work the retail store to "learn the store end of things." Pls.' App. at 801; Pls.' Am. Statement of Material Facts ¶ 282. When Guy turned in her application, however, no one inquired about Guy's interest, nor did anyone inform her of the retail store option. When Guy called to follow-up on her application, she was told on various occasions that someone would get back to her, or that the position was filled. Guys claims, however, that she subsequently saw advertisements for open "buying" positions.

### a. *Prima facie case.*

■■■ Guy contends that she established her prima facie case because she applied and was qualified for the positions, that she was rejected by Von Maur, and that Von Maur continued to seek applicants. Von Maur, however, claims that Guy cannot establish her prima facie case because there is no evidence that Guy even applied to Von Maur. That is, Von Maur states that pursuant to its record retention policy, all 2003 applications were maintained once it had notice of the present litigation. Von Maur claims that it does not have Guy's 2003 application. This missing application, according to Von Maur, is evidence that Guy did not apply. Despite its argument, Von Maur admits that "Guy went to Von Maur's corporate headquarters and asked the receptionist for an application and was given an application, which she then filled out." Def.'s Statement of Material Facts ¶ 775. Von Maur goes on to admit that "Guy asked to speak to someone concerning the position, but was told that someone would need to get back to her." *Id.* ¶ 778. Then, Von Maur states that "Guy called Von Maur three times and was told on each occasion that the company was still reviewing applications and someone would get back to her, although she did not hear from Von Maur after her calls." *Id.* ¶ 782. Given Von Maur's own statement of material facts, despite its arguments to the contrary, the Court finds that Guy applied for the "buying" positions, and, therefore, has satisfied her prima facie case.

### b. *Pretext.*

■■■ Because Guy satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. Von Maur

---

**34.** As noted above, Guy's 2000 application is barred by the statute of limitations. Accord-ingly, the Court will limit its analysis to Guy's 2003 application.

contends that it did not hire Guy because it "could not find her [ ] application." *See* Def.'s Br. at 85. In the alternative, it appears that Von Maur is claiming that even if it found her application, Guy was overqualified for the Buyer Assistant position. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Guy to show that Von Maur's proffered non-discriminatory reasons are pretext for discrimination.

■■■ With regard to Von Maur's position that it "could not find [Guy's] application," the Court notes that given Von Maur's own statement of facts admitting that Guy applied for the positions at Von Maur, that Guy was told by Von Maur that applications were being considered and that someone would get back to her, Von Maur cannot now claim in good faith that it lost her application. Indeed, by its own admission, Von Maur considered Guy's application.

Next, Von Maur contends that, in the alternative, Guy was not hired for the Buyer Assistant position because Guy was overqualified for the clerical position. Indeed, there is no dispute that Guy was not seeking a clerical position. Guy, however, states that she would have taken the clerical position if there were opportunities to advance, possibly to the Buyer position. Von Maur explained, unequivocally, that "*[n]o* individual at Von Maur becomes a buyer by moving up from a buyer assistant position, as that is not the career path for *any* employee to become a buyer." Def.'s Statement of Material Facts ¶ 768 (emphasis added). Guy, however, points to a Caucasian employee who was promoted from Buyer Assistant to Buyer in January 2001. *See* Pls.' App. at 438; Def.'s App. at 2273. Von Maur now admits that the Caucasian employee was promoted from Assistant Buyer to Buyer, but that "it was evident to Von Maur that transfer of an employee from clerical Buyer Assistant to

Buyer to sales was not effective" and that "[b]y 2003, it was well established that buyers are better suited to beginning their career track in the store." Def.'s Reply Br. at 49. That, however, is not what Von Maur initially stated in its material facts. Von Maur's post hoc explanation regarding a "non-transfer" policy is inconsistent with its previously unequivocal statement that *no* individual ever gets promoted to the Buyer position from the Assistant Buyer position. *See Bassett,* 211 F.3d at 1107 ("[I]f the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination."). Accordingly, a rational trier of fact could find Von Maur's reasons for not hiring Guy are evidence of pretext. *See Gaworski,* 17 F.3d at 1110 (noting that a jury could reject the employer's proffered reason because there was conflicting evidence on its believability). Guy, therefore, has satisfied her burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

11. *Maiden's evidence of discrimination.*

Maiden applied twice for a sales associate position at the NorthPark store in April and July 2004. Maiden was interviewed by Nelson in April, who decided that Maiden would be better suited to a "fast-paced area." Because there were no positions available in "fast-paced" areas at that time, Nelson placed Maiden's application in "active status." In July 2004, Maiden again applied for employment at NorthPark. Shortly thereafter, Maiden was interviewed by Roldan. Maiden was not hired.

a. *Prima facie case.*

Von Maur contends that Maiden cannot establish the second element of the prima

facie case, that she was qualified for the position. Maiden states that she was qualified for the position of sales associate. Von Maur, however, states that Maiden was not qualified because, during her second interview,[35] she made a statement that made Roldan, the interviewer, concerned as to whether Maiden would be able to follow Von Maur's policy prohibiting co-workers from discussing pay with each other. This subjective criteria, however, is more appropriately addressed in the pretext context. Given, moreover, that Von Maur admits that Maiden was passed on to a second interview, the Court finds that Maiden was minimally qualified for the sales associate position. As noted above, Von Maur is entitled at trial, to rely on evidence that its subjective criteria and subjective impressions, free from any discriminatory animus, made Maiden unqualified for the sales associate position. However, at this stage in summary judgment, the Court concludes that Maiden met the minimum objective qualifications for the position. *See Harrison*, 492 F.3d at 974 ("a plaintiff's burden at the prima facie stage is less onerous where the employer's hiring criteria are subjective"); *Lyoch*, 139 F.3d at 615 ("This lighter burden at the prima facie stage is justified by the fact that subjective criteria for [hiring] 'are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.' " (citation omitted)). Von Maur does not dispute the third or fourth [36] elements of the prima facie case. Accordingly, Maiden has satisfied her prima facie case.

b. *Pretext.*

Because Maiden satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. Von Maur contends that it did not hire Maiden because Roldan had concerns that Maiden would not follow Von Maur's policy prohibiting employees from discussing salary with co-workers, and had additional concerns about Maiden's longevity. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Maiden to show that Von Maur's proffered nondiscriminatory reasons are pretext for discrimination.

Maiden contends that Von Maur's reasons for not hiring her are pretext for discrimination. During the interview with Roldan, in response to a question,[37] Maiden recounted an incident where Maiden spoke to her manager about "pay discrepancy for someone else doing same job," and although the manager stated that Maiden "shouldn't be talking about pay ... [she] got pay increase next month." *See* Pls.' App. at 273. Although Maiden subsequently testified that she spoke to her manager about her pay only after two co-workers informed Maiden that she was being paid less than they were being paid for the same job, and that Maiden was not disciplined in any manner for bringing the pay discrepancy to the manager's attention, this information was either not relayed to Roldan or Roldan misunderstood Maiden's account of events. It is clear

**35.** As noted above, there is a dispute between the parties as to whether the interview in July 2004 was Maiden's second interview based on her April 2004 application, or whether Maiden's July interview was a first interview following her July 2004 application.

**36.** Von Maur argues for the first time in its reply brief that Maiden cannot satisfy the fourth element of the prima facie case. *See*

Def.'s Reply Br. at 41. Because Von Maur did not raise this argument in its opening brief, the Court need not and will not consider it. *See supra* note 33.

**37.** Taken from the "Sales Associate Second Interview Questions" form, Roldan asked, "Tell me about a time when you had to communicate negative or unfavorable information to someone." Pls.' App. at 272–73.

from Roldan's notation during the interview, however, that Maiden's manager told Maiden that she should not be talking about pay. Given that Von Maur, at the time, had a policy prohibiting employees from discussing salaries with co-workers, Roldan, based on her perception of Maiden's story, had a basis to be concerned. Even if Roldan over-reacted, the Court does not sit as a super-personnel department reviewing the wisdom or fairness of the business judgments made by employers, unless of course those judgments involve intentional discrimination. *Hutson,* 63 F.3d at 781. As noted above, employment discrimination laws "do not prohibit employment decisions based upon ... erroneous evaluations ... or even unsound business practices." *Hill,* 123 F.3d at 1120.

Next, Maiden contends that Von Maur's longevity concern is pretext for discrimination. Maiden points to Peterson's testimony that one year with an employer is sufficient for longevity. Von Maur, however, explains that it does not maintain a rigid requirement for a certain number of continuous years in employment with a single employer for an applicant to be deemed a longterm hire. Rather, Von Maur acknowledges that determining longevity of an applicant is a subjective criteria which is based on the totality of the applicant's circumstance. Here, Maiden's past employment history, at the time of her application, consisted of: one year at Kids Club (May 2001 to May 2002), three months at APAC (May 2002 to August 2002); four months at One Solution Staffing (May 2003 to September 2003), and four months at Kmart (September 2003 to January 2004). While Maiden worked one year at Kids Club, her more recent positions reflected a lack of longevity. Accordingly, Maiden has not established that Von Maur's explanations for not hiring her are pretext for discrimination. Maiden, therefore, has not satisfied her burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

12. *EEOC Class Member: Parks' evidence of discrimination.*

On October 25, 2004, Parks applied for a truck driver position at Von Maur Center after seeing an advertisement for open positions. Although Parks had twenty-five years of truck driving experience, he was never interviewed for the position. Von Maur, however, interviewed and hired Rich Pannell ("Pannell"), a Caucasian applicant who applied three days after Parks, on October 28, 2004.

a. *Pretext.*

 Because Von Maur does not dispute that Parks can establish a prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring Parks. Von Maur contends that it did not hire Parks because it hired a "more qualified" applicant, Rich Pannell.[38] This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to Parks to show that Von Maur's proffered non-discriminatory reason is pretext for discrimination.

To satisfy his burden of demonstrating pretext, Parks first contends that Von Maur did not screen his application, which is contrary to its normal practice of screening all of its applications. It appears, however, that Von Maur did screen Parks' application. Indeed, Parks testified that when he turned in his application to the receptionist, a lady "approached me and asked me a few questions about what I was applying for. And I think—I know I did, I told her." Def.'s App. at 1032.

---

**38.** Pannell, who is Caucasian, applied for the open truck driving position on October 28, 2004, three days after Parks. *See* Def.'s App. at 2458; Pls.' App. at 427.

Moreover, it appears that Parks was asked to provide copies of certain documents relating to his military discharge. *Id.* Thus, to the extent that Von Maur needed to screen Parks, it did so by having Parks answer "a few questions" and by requesting certain documentation.

Next, Parks contends that Von Maur hired a less qualified Caucasian applicant over him. Specifically, Parks points out that Von Maur hired Pannell, who only has eight and one-half years of truck driving experience, while Parks has at least twenty-five years of truck driving experience. Von Maur, however, notes that despite Parks' experience, Pannell was better qualified for the position because Parks had a gap in his employment history and because Parks had not consistently driven a tractor trailer since 1991. Indeed, Parks' resume shows that he had a four year gap in employment from 2000 to April 2004. Def.'s App. at 1049. However, Pannell's application also shows a gap in employment history—from June 1998 to May 2000. *Id.* at 2459. Thus, Von Maur cannot contend that Parks' gap in employment history made him less qualified than Pannell when Pannell, himself, had a gap in employment history.

■ As for Parks' experience driving tractor trailers, Parks' resume also shows that he was a tractor/trailer operator (operated semi-hydraulic trailer) from April to September 2004. Parks subsequently testified that he did not consistently drive a tractor trailer since 1991, but there is no indication that Von Maur knew that information at the time Parks applied for the position. Von Maur argues that Pannell was, nevertheless, more qualified than Parks because Pannell "had 10 years of CDL driving history and was employed as a truck driver ten of the eleven previous years." Def.'s Br. at 99. As explained by the Eighth Circuit, "[e]vidence of similar qualifications between [plaintiff] and the

selected candidates is insufficient to support a finding of pretext; rather, [plaintiff] must show the finalists were less qualified than he." *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 916 (8th Cir. 2007). Here, it does not appear that Pannell is *less* qualified than Parks, despite the fact that Parks has more experience. It appears that Von Maur focused more on tractor trailer driving experience, and preferred drivers with more recent, as opposed to total, experience. *See id.* ("Although an employer's selection of a less qualified candidate can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual, it is the employer's role to identify those strengths that constitute the best qualified applicant." (citation omitted)).

■ The Court's concern, however, is that in rejecting Parks, Von Maur sent a letter to Parks stating that "Von Maur had hired someone within [its] own workforce." Def.'s Statement of Material Facts ¶ 995. Presently, however, Von Maur states that it hired Pannell because he was more qualified than Parks. Pannell, of course, was a new hire, not yet part of Von Maur's workforce. In regards to Parks' regret letter, the following exchange took place:

Q: Okay. And after you left Von Maur, what was your next contact with Von Maur, if any?

A: I think the only contact from that point on was, I think I got a letter indicating that they hired someone within their own workforce. I think.

Def.'s App. at 1041. It is unclear to the Court whether Parks' last "I think" refers to any contacts he had with Von Maur after filling out his application, or whether it refers to the reason that Von Maur provided for not hiring him. Regardless, Von Maur acknowledges in its statement of facts that Parks received a letter from Von Maur stating that it hired from its own workforce. With that established,

Von Maur does not provide any explanation for the change in its reason for not hiring Parks—informing Parks that it hired from within versus hiring Pannell because he was more qualified. Indeed, it may have simply been a clerical error on Von Maur's part in sending an incorrect rejection letter to Parks. At this stage in summary judgment, however, making all reasonable inferences in favor of Parks, the Court concludes that a rational trier of fact could find Von Maur's varying reasons for not hiring Parks are evidence of pretext. *See Peterson*, 406 F.3d at 522 (noting that a jury could reject the employer's proffered reason because there was conflicting evidence on its believability); *see also Bassett*, 211 F.3d at 1107 ("[I]f the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled to all favorable inferences that the false reason given masks the real reason of intentional discrimination."); *EEOC*, 477 F.3d at 570 (stating that "false or shifting reasons support a finding of illegal motivation" (citation omitted)). Parks, therefore, has satisfied his burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

13. *EEOC Class Member: Jacks' evidence of discrimination.*

In May 2004, Jacks applied for a part-time sales associate position at the North-Park store. Jacks, who is an Associate Dean for Admissions at Grinnell College, sought employment to supplement her income. Jacks was interviewed by Lommell and Roldan, both of whom thought Jacks interviewed well. Jacks was not hired.

a. *Prima facie case.*

Von Maur contends that Jacks cannot establish the second element of the prima facie case, that she was qualified for the position. Jacks contends that she was qualified for the sales association position. Von Maur states that Jacks was not quali-fied because it had concerns over Jacks' future availability and dependability, especially once school started. This subjective criteria, however, is more appropriately addressed in the pretext context. Given, moreover, that Jacks was passed on to a second interview, and that Von Maur "liked and wanted to hire Jacks," the Court finds that Jacks was minimally qualified for the sales associate position. As noted above, Von Maur is certainly entitled at trial, to rely on evidence that its subjective criteria and subjective impressions, free from any discriminatory animus, made Jacks unqualified for the sales associate position. However, at this stage in summary judgment, the Court concludes that Jacks met the minimum objective qualifications for the position. *See Harrison*, 492 F.3d at 974; *Lyoch*, 139 F.3d at 615. Von Maur does not dispute the third or fourth elements of the prima facie case. Accordingly, Jacks has satisfied her prima facie case.

b. *Pretext.*

Because Jacks satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. Von Maur contends that it did not hire Jacks because Roldan and Lommell, Jacks' first and second interviewers, respectively, had concerns about Jacks' future availability and longevity once the school year started in the fall. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Jacks to show that Von Maur's proffered non-discriminatory reasons are pretext for discrimination.

Jacks contends that she never told Roldan or Lommell that she was seeking a summer position. Rather, it was her intention to continue with the part-time sales associate position even after the school year started. Despite Jacks' assertion, however, Jacks told Roldan during her interview that her responsibilities at Grin-

nell College included visiting high schools in her territory and attending college fairs, which required travel and took place in the fall. Def.'s Statement of Material Facts ¶ 1029. Thus, even if Jacks expressly told Roldan or Lommell that she was seeking a part-time position to continue into the school year, it was reasonable for Von Maur to have concerns about Jacks' availability and longevity once the school year started, given that Jacks was required to travel to high school and college fairs. *See Hutson,* 63 F.3d at 781 (explaining that employment discrimination laws "have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination"). Thus, even if the Court determined that Roldan or Lommell misconstrued Jacks' fall schedule and travel responsibilities to incorrectly presume that Jacks was only seeking a summer position, the Court still cannot conclude that Von Maur's explanations are pretext for discrimination. Indeed, employment discrimination laws do not prohibit employment decisions based upon erroneous evaluations or even unsound business practices. *Hill,* 123 F.3d at 1120; *see Arnold,* 471 F.3d at 847. Jacks, accordingly, has not satisfied her burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

14. *EEOC Class Member: Allen's evidence of discrimination.*

a. *Allen's 2003 application.*

1. *Prima facie case.*

Allen first applied for a part-time sales associate position in the summer of 2003 at the NorthPark store. Von Maur claims that it does not have a record of Allen's application. Regardless, Von Maur contends that Allen cannot establish the fourth element of the prima facie case, that Von Maur continued to seek applicants after she was rejected. Allen, however, points to Von Maur's employee hire chart to demonstrate that Von Maur continued to seek and hired sales associates after it rejected Allen. *See* Pls.' App. at 432–465. As noted above, the Court cannot determine from the chart into what positions the applicants were hired. Nonetheless, Von Maur does not dispute Allen's claim, and indeed, acknowledges that it sought and hired applicants after Allen was rejected. *See* Def.'s Br. at 111.

2. *Pretext.*

Because Allen satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring her. Von Maur intimates that it did not hire Allen because she did not apply for the position in 2003, or because Von Maur lost her application. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Allen to show that Von Maur's proffered non-discriminatory reasons are pretext for discrimination. Here, Allen does not offer any evidence that Von Maur's reasons are pretext for discrimination.[39] Accordingly, Allen has not satisfied her burden of establishing pretext for her 2003 application under the *McDonnell Douglas* burden-shifting framework.

b. *Allen's 2004 application.*

1. *Prima facie case.*

On or about June 2004, Allen applied for a data entry position through an online

---

**39.** Plaintiffs' blanket reasons to establish pretext for the Plaintiffs in general, i.e., shifting explanation for not hiring, inconsistent application of policy, and "inexorable zero," i.e., that there were no African–Americans in the position, do not apply to the facts of Allen's 2003 application for a part-time sales associate position.

application process. Von Maur contends that Allen was contacted on two occasions, July 9, 2004, and again on July 27, 2004, in an attempt to pursue her as a candidate. According to Von Maur, Allen never returned the telephone calls. Allen, however, contends that she never received the messages from Von Maur. The notations on Allen's online application state, "LM 7/9 @ 12:38," and "Try to call Tuesday 7/27." Def.'s App. at 25, 26. Allen does not suggest that the notations are incorrect. Rather, she claims that she did not receive any message from Von Maur. *See* Pls.' App. at 664 ("Q: After you submitted [the online application], did you hear from Von Maur? A: I didn't hear anything. Maybe if my husband came home and heard a message, he probably didn't tell me.... We both had busy lifestyles. I was at school. He was at school. He was working on his masters."). It appears that Von Maur attempted to contact Allen to pursue her as a candidate and Allen, for some reason, failed to get the messages. Accordingly, even if the Court accepted Allen's account of events, that she did not get the messages, Allen still cannot establish the third element of the prima facie case— that she was rejected by Von Maur. Allen, therefore, has failed to establish her prima facie case.

15. *EEOC Class Member: Ash's evidence of discrimination.*

On June 22, 2004, during Von Maur Center's second day of its open house interviewing, Ash applied for all entry-level positions. Place interviewed Ash initially and passed her for a second interview. Both interviewers stated that Ash interviewed well, but informed her that all positions were filled. Ash subsequently received a standard regret letter.

a. *Prima facie case.*

Von Maur contends that Ash cannot establish the third element of the prima facie

case, that she was rejected by Von Maur. Specifically, Von Maur states that it attempted to extend an offer of employment to Ash over the telephone on two occasions, but that Ash never returned the calls. Ash, on the other hand, states that she can establish the third element of the prima facie case because after her first or second interview, the interviewer told her that although she interviewed well, that all the positions were filled. *See* Pls.' App. at 678. Ash, moreover, testified that a "couple weeks" after the interview, she received a regret letter from Von Maur. *See id.* at 677, 679. Accordingly, at this stage in summary judgment, the Court finds that there is a genuine of material fact as to whether Ash was rejected by Von Maur. Because Von Maur does not dispute that Ash can establish the remaining elements of the prima facie case, Ash has satisfied her prima facie case for purposes of summary judgment.

b. *Pretext.*

Because Ash satisfied her prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring Ash. Von Maur states that it did not hire Ash because she did not return the telephone calls. This non-discriminatory reason satisfies Von Maur's minimal burden, and the burden shifts back to Ash to show that Von Maur's proffered non-discriminatory reason is pretext for discrimination.

Here, Ash does not offer any evidence that Von Maur's reason is pretext for discrimination, other than her assertion that she never received any telephone messages from Von Maur. The notations on Ash's application state, "LM 7/2," "L/M 7/9/04," and "no call back I called on 7/9/0/4 CR [Cathy Rockwell]." Def.'s App. at 2257. Ash does not suggest that the notations are incorrect, but rather asserts

that she did not receive the telephone messages from Von Maur. It appears from the record that Von Maur attempted to contact Ash to extend her an offer of employment and Ash, for some reason, failed to get the messages. *See* Def.'s App. at 68 ("Q: Okay. Has it happened on occasion where you—a message got erased or you didn't get a message? A: Oh, yes."). Accordingly, Ash has not produced any evidence that Von Maur's reason for not hiring her—not returning the telephone calls—is pretext for discrimination. Ash, therefore, has not satisfied her burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework.

16. *EEOC Class Member: Miller's evidence of discrimination.*

Miller states that in October 2004, and again in November 2004, he applied online for entry-level corporate positions at Von Maur Center. Miller claims that he qualified for the positions, but that no one from Von Maur contacted him.

a. *Miller's October 2004 application.*

1. *Prima facie case.*

Von Maur contends that it did not have online capability until November 2004 and, therefore, Miller could not have applied online in October 2004. In support, Von Maur points to Haun's testimony, where the following exchange took place: "Q: And how long has [the online application] been possible technologically within Von Maur? A: My recall is November of 2004." *See* Def.'s App. at 383. Von Maur, therefore, states that Miller cannot establish the second element of the prima

facie case, that he applied for an open position. Neither party, however, acknowledges the fact that Allen applied online for a data entry position in July 2004. It may be that Allen's online application, submitted through the *Quad City Times* Virtual Career center, was a different "online" method than that used by Miller, however, neither party discussed this issue. Accordingly, at this stage in summary judgment, making all reasonable inferences in favor of Plaintiffs, the Court finds that Von Maur had the capability to accept online applications, at least in some form, as early as July 2004. Thus, given that Miller testified that he applied online in October 2004, the Court concludes that he has satisfied the second element of the prima facie case. Because Von Maur does not dispute that Miller can establish the remaining elements of the prima facie case, Miller has satisfied his prima facie case.[40]

2. *Pretext.*

Because Miller satisfied his prima facie case, the burden shifts to Von Maur to articulate a legitimate, non-discriminatory reason for not hiring him. Von Maur intimates that it did not hire Miller because Von Maur never received or lost his application. These non-discriminatory reasons satisfy Von Maur's minimal burden, and the burden shifts back to Miller to show that Von Maur's proffered non-discriminatory reasons are pretext for discrimination.

Here, Miller states that Von Maur's reasons are pretext for discrimination because of eleven executive trainees hired during 2001 to 2004, all were Caucasian.

---

**40.** To the extent that Von Maur's reference, "[d]itto the above analysis," in comparing Miller's October 2004 online application to Von Maur Center with his alleged 2004 application to Von Maur's Lombard, Illinois location is somehow an attempt to dispute that Miller was qualified for the positions at Von

Maur Center because he was "applying for a summer job" when he applied to the Lombard store, that argument would be without merit as Miller testified that when he applied online in October 2004 to Von Maur Center, it was in an effort to seek full-time employment. *See* Def.'s Br. at 119; Def.'s App. at 923.

*See* Pls.' App. at 530. Despite the initial disparity, Plaintiffs provide nothing more to demonstrate pretext through statistical evidence. *See Hutson,* 63 F.3d at 778 (recognizing that statistical evidence "may support a finding of pretext, particularly where there are independent, direct grounds for disbelieving the employer's explanation for [the employment action]"); *but see Coble v. Hot Springs Sch. Dist.,* 682 F.2d 721, 734 (8th Cir.1982) ("Standard deviation analysis is not particularly helpful in evaluating the statistical significance of small samples."). That is, Plaintiffs' expert does not compare the number of executive hires to the number of executive applicants, or even mention the number of African–Americans in the relevant pool that are qualified for executive positions. Rather, Plaintiffs' expert groups all current Von Maur *employees* and compares that number with the number of African–Americans working in "comparable" stores in the area, and with the number of qualified African–Americans available in the relevant pool. *See* Pls.' App. at 644–47. This type of comparison does not aid the Court in determining whether Von Maur engaged in discriminatory *hiring* practices for *executive* positions during the relevant time period. Accordingly, Miller has not satisfied his burden of establishing pretext under the *McDonnell Douglas* burden-shifting framework or through statistical evidence.

b. *Miller's November 2004 application.*

1. *Prima facie case.*

Miller testified that he again applied online in November 2004, for entry-level corporate positions at Von Maur Center. Von Maur states that because there were no open entry-level positions at Von Maur Center in November 2004, that Miller cannot establish the second element of the prima facie case, that he applied for open positions. A careful reading of Miller's testimony supports Von Maur's contention. Although Miller testified that the positions he applied for in October 2004 were "available" positions, there is no indication that the positions that Miller applied for in November 2004 were open. *See* Pls.' App. at 917 ("Q: And what do you recall about the positions that were on-line as listed as available with Von Maur in October of 2004? A: What do you mean? Q: I mean, did they say they needed—they were hiring a buyer? A: Yes, those were available positions. Q: Did they say they had management trainee positions? A: Yes."). The closest line of questioning the Court could identify which may even possibly suggest that the positions that Miller applied for online in November 2004 were open, is as follows:

Q: Okay. And we have talked about the buyer position that you applied for and the management trainee position, I guess; is that correct?

A: There were other positions. Like I said, I don't recall what else I applied for, but the positions that I did apply for, I met the qualifications unless I would have never applied for them, per that Web site.

Q: Did the Web site describe the qualifications needed for the jobs?

A: Yes.

Q: What was described?

A: I don't recall.

Q: Anything else that leads you to believe that Von Maur was discriminating against you by November of '04?

A: Not that I recall.

Q: Okay.... Do you have any idea how many people applied for these jobs, the jobs you say you saw on the Web site in the fall of '04?

A: No.

*Id.* at 921. Regardless, even if the Court were to conclude that Miller satisfied the

second element, and hence established his prima facie case, Miller cannot establish pretext. Specifically, Von Maur states that it never received or lost Miller's November 2004 online application. Thus, for the same reasons noted above in Miller's October 2004 online application pretext analysis, Miller cannot establish pretext for discrimination. Accordingly, even if the Court determined that Miller satisfied his prima facie case, Miller's claim would still fail because Miller has not satisfied his burden of establishing pretext under the McDonnell Douglas burden-shifting framework or through statistical evidence.

## IV. CONCLUSION

For the reasons stated above, Von Maur's Motion for Summary Judgment (Clerk's No, 161) is GRANTED IN PART and DENIED IN PART. Von Maur's Motion for Summary Judgment is GRANTED as to Havilah Johnson, the Estate of Ward, Darlena McBride, Tanya Gardner, Robert Donelson, Roscoe Haymon, Charles Smith, Raquel Maiden, Marlene Jacks, Lawanda Jones Allen, Jacqueline Ash, and La'Quan Miller, and DENIED as to Robert Williams,[41] Latoya Young, Damenica Johnson,[42] Machelle Guy,[43] Paul Parks, and as to any arguments asserted by Defendant not specifically addressed in this Order.

IT IS SO ORDERED.

---

**41.** As discussed above, Von Maur's Motion for Summary Judgement is granted as to any claims arising out of Robert Williams' June 2003 application.

**42.** As discussed above, Von Maur's Motion for Summary Judgment is granted as to any

claims arising out of Damenica Johnson's 2001 and 2002 applications.

**43.** As discussed above, Von Maur's Motion for Summary Judgment is granted as to any claims arising out of Machelle Guy's 2000 application.